Patricia CURRY, Appellant,

v.

UNITED STATES, Appellee.

Wayne P. WASHINGTON, Appellant,

v.

UNITED STATES, Appellee.

James C. JONES, Appellant,

v.

UNITED STATES, Appellee.

Nos. 84–610, 84–661 and 84–867.

District of Columbia Court of Appeals.

Argued May 6, 1986.
Decided Jan. 14, 1987.
As Revised March 31, 1987.

Lawrence M. Baskir, Washington, D.C., appointed by the court, for appellant Curry.

Matthew C. Leefer, Boonsboro, Md., appointed by the court, for appellant Washington.

Steven M. Salky, with whom Roger E. Zuckerman and Michael R. Smith, Washington, D.C., were on brief, for appellant Jones.

Linda S. Chapman, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., Michael W. Farrell, and G. William Currier, Asst. U.S. Attys., Washington, D.C., were on brief, for appellee.

Before MACK and NEWMAN, Associate Judges, and PAIR,* Senior Judge.

MACK, Associate Judge:

Three police officers, armed with a search warrant, seized heroin, cocaine and a loaded pistol from an apartment in Northeast Washington. Appellants Patricia Curry, James Jones and Wayne Washington were each charged with possession of heroin with intent to distribute,[1] possession of cocaine with intent to distribute,[2] possession of an unregistered firearm,[3] and unlawful possession of ammunition.[4] The jury found Jones and Washington guilty as charged. They were sentenced to identical terms of imprisonment, totalling from six

* Senior Judge Pair concurs in the result.

1. D.C.Code § 33–541(a) (1981).

2. Id.

3. Id. § 6–2311(a).

4. Id. § 6–2361(3).

years and eight months to twenty years, and Jones was fined an additional $75,000 for his drug convictions. The jury acquitted Curry of the drug charges, but returned a guilty verdict on the firearm and ammunition charges. She was sentenced to 180 days imprisonment, all but 30 days to be suspended, with two years of probation to follow her release.

A number of contentions are raised on appeal. We are persuaded by one—that the evidence was insufficient to convict on the firearm and ammunition charges. On those counts, the convictions of all three defendants must be reversed. Curry, having been acquitted by the jury on the drug charges, therefore has no convictions remaining. As for Jones and Washington, the several challenges raised against their drug convictions, while some have merit, do not constitute reversible error.

We reverse all convictions for unlawful possession of the firearm and ammunition; we affirm the convictions of Jones and Washington for possession of heroin and cocaine with intent to distribute.

I

*The Government's Evidence*

At about 11:45 p.m. on October 16, 1981, three officers of the Metropolitan Police Department executed a search warrant at Apartment Four of a building in Northeast Washington. On their arrival, the officers noticed a red ribbon on the door of the apartment. At trial, a narcotics expert testified that a distinctive item of that nature is commonly used to signal that a large-scale drug distribution operation is open for business. The officers knocked, announced initially that they were there to investigate a traffic complaint, and entered when Washington opened the door. The officers did not need to use the battering ram they had brought with them.

Jones and Washington were inside the apartment with two women and another man. Curry was not present. The men were searched and the women patted down. All five were then kept in the living room while the police officers conducted their search of the premises. Large quantities of heroin and cocaine were discovered.

Upon their entry, the officers observed Washington seated on a couch in the living room and ordered him to show his hands. Washington refused. Turning his back to the officers, Washington made furtive hand movements. From the couch on which he sat the officers immediately retrieved 3 packets of heroin and a straw. On the coffee table in the same room was a wallet containing numerous credit cards and a money order in the name of Jones. In that wallet were 2 packets of heroin. Heroin was found in two locations in the bedroom. On top of the dresser was 1 foil packet of the drug. In a drawer of the same dresser, the officers found 40 packets of heroin. These packets were contained in 6 "strips," a form of packaging which the government's narcotics expert testified made the heroin easily separable into many smaller "decks" of 20 or "bundles" of 5 suitable for street distribution by a retailer known as a "runner." In a trash receptacle by the rear door, the officers found an envelope containing 9 packets of heroin and $75 in cash.

Cocaine was also seized in abundance. A bag of rice in the bedroom dresser drawer (where the 40 packets of heroin were found) contained 8 packets of cocaine. In the refrigerator was another bag of rice, this one containing 31 packets of cocaine. Detective Dwight Rawls of the Heroin Task Force, the government's narcotics expert, testified that cocaine can be mixed with rice to keep it dry and that its purity can be preserved by refrigeration.

In all, 10,011 milligrams of heroin and 10,496 milligrams of cocaine were found in the apartment.

Two large bags of quinine and manitol were retrieved from the bedroom closet.

Detective Rawls told the court that quinine and manitol are used to dilute heroin and cocaine to their normal street strength. Manitol also relieves the constipation suffered by heroin users. The Drug Enforcement Agency's laboratory analysis of the heroin and cocaine seized from the apartment showed that the drugs had been mixed with quinine or manitol, or both.

A loaded nine-millimeter handgun was found amongst women's clothing in a nightstand in the bedroom. This pistol did not carry the fingerprints of any of the appellants. None of the three was registered to carry a pistol on the date of their arrest.

In addition to the heroin, cocaine, handgun and ammunition, the officers seized several other items. In the wallet on the living room coffee table, together with two packets of heroin and credit cards in the name of Jones, was a money order receipt dated about a month before the raid took place. The money order was written by Jones in payment of $122 rent for the apartment where the search took place. Other personal belongings identifying Jones as their owner were found on the floor. In the dining area was an envelope containing various papers, including several items of identification in the name of Washington. On top of the dresser in the bedroom, the search team found a change of address card for Curry, in her handwriting, directing the postal service to forward her mail to Apartment Four. Also on top of the dresser was a pouch containing several items of identification in Curry's name, an address book with her name on the front page, and an envelope mailed to her at another address.

A radio scanner, in plain view, was receiving police broadcasts when the search team entered the apartment. Also in plain view was a "Seal-a-Meal" device which, according to the government's narcotics expert, could be used to seal the "decks" of narcotics for street sales. This appliance

carried the thumbprint of Jones. A total of $1,171 in cash was seized, including $266 from the third man who was present during the search and who unsuccessfully attempted to escape through the back door when the police arrived.

During the raid, Washington identified as his own a set of keys that fit Apartment Four. Another set of apartment keys was found in a jacket in the living room; this jacket fitted Jones and, although he never claimed it as his own, Jones was given it to wear to the police station.

Various papers, notebooks, memo pads and calendar books were recovered from a satchel in the dinette area, and a calendar book was taken from the top of the bedroom dresser where it lay amongst various items belonging to Curry. The government's handwriting expert, James Miller, studied authentic handwriting samples and, on that basis, attributed the handwriting on the seized documents to the three appellants. Miller also concluded that the samples submitted by Washington and Curry showed a "drastic disguise" when compared to their normal handwriting. Miller did not describe Jones' handwriting sample as disguised, but did remark that it was slightly "deteriorated."

The seized documents were also shown to Detective Rawls, the narcotics expert. According to Detective Rawls, the papers appeared to be the records of a large-scale drug distribution operation. He said that the base of this type of operation is commonly known as a "house." The person in charge of the operation will normally obtain the premises, pay the rent and establish a security system, so that the "house" is not robbed or raided by the police. A typical method by which large-scale drug dealers avoid detection is an occasional change in the hours of business and the location of the "house." That a "house" is open for business is usually signalled by

some symbol such as a light or a color code.

Heroin sold on the streets is first diluted, or cut, then weighed or measured, and then packaged. The package is heat-sealed or rolled and either sold individually or released in fives, tens, twenties or fifties for redistribution. Detective Rawls testified that the weighing, measuring, cutting and packaging of the drugs do not necessarily take place in the same premises as the selling for resale on the streets. However, the presence of a "Seal-a-Meal" device could indicate that some packaging took place in Apartment Four. Drug dealers often keep records of their transactions so as to keep control over their stock and their assets. Such records also prevent internal cheating and reveal which customers are reliable. Telephone logs, he said, can be used to take orders.

Detective Rawls testified that the documents seized from Apartment Four were consistent with the records of the operation he described. A sheet of paper in appellant Jones' handwriting appeared to be a narcotics price list. It showed prices of $2,000 for an ounce of cocaine, $1,050 for a "half" and $550 for a "quarter." A calendar book, containing entries by Jones and Washington, gave a running tally of the amounts owed by various customers. Other pages carried calculations of amounts and prices. Still others indicated the availability of "bone," a particularly strong grade of heroin normally diluted before use. Two memo books, both in Jones' handwriting, recorded the size and price of various transactions and the names of the customers. One used the notation "H" for "half" and "Q" for "quarter," the standard street measurements for heroin. The price of "bone" was also included. This memo book revealed information about drugs that were sold out of the "house" rather than on the street. It showed that heroin, cocaine and "bone" were available. The amounts owed by various individuals were also included. The second memo book contained similar details, including the availability of a stock of 54 "halves" at a price

of $810. It also mentioned the availability of 54 "eggs," bags of heroin cut or "scrambled" for street sale, at a price of $10 per bag. A calendar book in Jones' handwriting gave names of customers, showed the amount of drugs purchased and noted amounts that were still owed. It referred to heroin as "tape," a then current street name, and quinine as "iron."

Two other sheets of paper were described by Detective Rawls as a telephone log. With the exception of one entry, these were in the handwriting of Jones and Washington. The one exception in the telephone log was actually the only entry in Curry's handwriting in any of the distribution records. It said, simply: "8:30 p.m. Tyrone called. Call him at home." The other telephone calls, all received by Jones and Washington, were also dated and showed the times and quantities of transactions and the names of customers. One sale of "bone" was for a price of $60. Detective Rawls testified that the prices listed in the inventories and telephone logs were consistent with the then current rates for heroin and cocaine.

### Appellant Curry's Arrival during the Raid

While still in progress, the raid was interrupted by a knock on the door. A man carrying a bag filled with unused syringes was told by one of the officers to come into the apartment. He ran. After a short chase, the visitor was caught outside by several other officers.

During the chase, a Ford Thunderbird pulled up across the street from the apartment. One of its occupants was Curry. Upon request, she gave the officers three addresses, one being that of Apartment Four. Curry was carrying a set of keys that fit the apartment.

### The Defense Evidence

Jones called two witnesses on his behalf, including Detective Rawls, neither of whom contradicted the government's evidence in

any significant respect. Washington presented no evidence at trial.

Curry, in contrast, denied any connection with the drugs or the loaded pistol. She told the jury that, following an argument, she moved out of her mother's house and into a friend's apartment. Upon hearing from Jones that he had a vacant room, Curry arranged to "crash" there until she could find a place of her own. She first slept in Apartment Four on October 1, 1981, fifteen days prior to the search. During the next couple of weeks, Curry slept in the apartment only six or seven times. On those occasions, Curry testified, she only used the apartment to "crash" in and to change clothes before going to work. She did not pay rent. To Curry's knowledge, nobody else slept there or used the bedroom.

A couple of days before the raid, Curry had arranged to go to the movies on the evening of October 16 with her brother and a friend. She arrived home from work at about 7:00 p.m., changed her clothes, and left immediately.

Upon her return sometime between 12:30 and 12:45 a.m., Curry saw three strangers chasing another stranger. Observing the chase, Curry described the incident to her fellow movie-goers as probably just the usual "Friday night brawl." The plain-clothes officers, after catching the individual who had unwittingly interrupted the raid, ran up to the parked car and pulled out its occupants. Having identified herself, Curry gave the officers three addresses—her mother's, that of the friend with whom she stayed after leaving her mother's home several weeks previously, and the apartment across the street where the raid was then in progress. When one police officer grabbed her, threatened her, slammed her against the car, and accused her of selling drugs out of the house, Curry insisted she did not know what he was talking about.[5] Curry was then taken into the apartment, thrown across the room onto the sofa, handcuffed and arrested.

At trial, Curry acknowledged making an entry in the phone log—"8:30 p.m. Tyrone called. Call him at home."—but denied having received instructions to take messages and claimed that there was nobody at home when she received the call. Curry did not recall seeing a police scanner or a "Seal-a-Meal" device in the apartment.

Apart from testifying herself, Curry also called other witnesses on her behalf. Her brother and her friend confirmed Curry's story about going to the movies together that evening and the circumstances surrounding Curry's arrest upon arriving back at the apartment. Curry's mother agreed that she had asked her daughter to move out of her home after an argument in late August and that Curry had then moved into a friend's apartment, from which she moved again shortly afterwards into Apartment Four where the drugs and firearm were found. Three witnesses testified that Curry had an excellent reputation for truthfulness.

## II

One contention is common to all three defendants—that the evidence against them was insufficient to convict for unlawful possession of the firearm and ammunition found in the bedroom. We agree.

■ On a criminal charge, the government carries the constitutional burden of proving to the jury that the accused committed each element of the charged offense beyond any reasonable doubt. *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970). In keeping with this principle, a criminal defendant may move for judgment of acquittal on the ground that the evidence presented at trial was legally insufficient to permit the jury to conclude guilt to the required degree of certainty. "[I]f there is no evidence upon which a reasonable mind might fairly conclude guilt beyond reasonable doubt, the motion must be granted." *Curley v. United States*, 81 U.S.App.D.C. 389, 392–93, 160

---

5. On rebuttal, the police officer denied he had

made abusive statements or used obscenities.

F.2d 229, 232–33, *cert. denied,* 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947).

So as not to displace the role of the jury, the court deciding the motion must review the evidence in the light most favorable to the government, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, and making no distinction between direct and circumstantial evidence. *United States v. Covington,* 459 A.2d 1067, 1070–71 (D.C.1983); *see also United States v. Hubbard,* 429 A.2d 1334, 1337–38 (D.C.), *cert. denied,* 454 U.S. 857, 102 S.Ct. 308, 70 L.Ed.2d 153 (1981). The motion for judgment of acquittal must be granted if the evidence, when viewed in the light most favorable to the government, is such that a reasonable juror *must* have a reasonable doubt as to the existence of any of the essential elements of the crime. *Austin v. United States,* 127 U.S.App.D.C. 180, 189, 382 F.2d 129, 138 (1967). In other words, the evidence is insufficient if, in order to convict, the jury is required to cross the bounds of permissible inference and enter the forbidden territory of conjecture and speculation. *Shelton v. United States,* 505 A.2d 767, 770–71 (D.C.1986).

The evidence need not compel a finding of guilt beyond a reasonable doubt. Therefore, a motion for judgment of acquittal should not be granted where the evidence is such that a reasonable mind might or might not have a reasonable doubt as to the guilt of the accused. *Crawford v. United States,* 126 U.S.App.D.C. 156, 158, 375 F.2d 332, 334 (1967). Upon review, this court employs the same standard as that applied by the trial court in determining whether the evidence was sufficient to convict. *United States v. Covington, supra,* 459 A.2d at 1071; *see also United States v. Hubbard, supra,* 429 A.2d at 1338.

In this case, none of the three appellants had actual possession of the loaded pistol which was found in the nightstand in the bedroom. Their convictions can be sustained only if the government presented sufficient evidence to establish that each of the three had "constructive possession." We recently summarized the principles governing charges of constructive possession in *Wheeler v. United States,* 494 A.2d 170 (D.C.1985). It is those principles which govern here.

In order to satisfy its burden of proving constructive possession, the government is obliged to meet a two-pronged test. First, it must present evidence from which a reasonable mind could conclude, beyond a reasonable doubt, that the accused knew of the presence of the contraband; second, the evidence must allow the factfinder to conclude, to the same degree of certainty, that the accused exercised a right to dominion or control over the object in question. Knowledge of the whereabouts of the illegal item may be inferred from circumstantial evidence. Dominion or control over an object is shown when the accused has some appreciable ability to guide its destiny; the right to exercise dominion or control may be jointly shared. *Id.*

We have held that the government must show that the illegal item is in such proximity to the accused as to be convenient of access. *Waterstaat v. United States,* 252 A.2d 507, 508 (D.C.1969). However, mere proximity to an illegal item does not of itself prove knowledge coupled with dominion or control. *Johnson v. United States,* 503 A.2d 686, 688 (D.C. 1986) (per curiam); *United States v. Pardo,* 204 U.S.App.D.C. 263, 277, 636 F.2d 535, 549 (1980). While an accused's mere presence at the scene of the crime, proximity to the contraband, or association with one who is in possession do not in themselves support a finding of constructive possession, that presence, proximity or association may establish a prima facie case of constructive possession if it is colored by evidence linking the accused to an ongoing criminal operation of which that possession is a part. *United States v. Hubbard, supra,* 429 A.2d at 1338; *see also United*

*States v. Staten,* 189 U.S.App.D.C. 100, 107, 581 F.2d 878, 885 (1978). On the other hand, any legitimate inference which can be drawn from such presence, proximity, or association is considerably weakened where the accused is one of several people gathered in the place where the contraband is found.

 Where illegal items are seized from a residence, constructive possession will not usually be found absent some proof that the accused is something other than a visitor. *Wheeler v. United States, supra,* 494 A.2d at 173. If the premises are occupied by more than one person, the government should present evidence of the regularity with which the accused occupies the residence, together with evidence concerning the accused's relationship with the co-occupant, and that evidence should be sufficient to indicate a possessive interest in its contents. *See United States v. Herron,* 185 U.S.App.D.C. 403, 406, 567 F.2d 510, 513 (1977). In cases where the accused is a resident of premises to which others have access, courts will not normally impute possession of an illegal item without proof that the accused is actually involved in some criminal enterprise of which the contraband is a part. *Wheeler v. United States, supra,* 494 A.2d at 173. Circumstances indicating a concert of illegal action obviously tend to dispel the natural fear that the doctrine of constructive possession is casting too wide a net. *Id.* Thus, attempts to hide or destroy evidence may buttress an inference of constructive possession, as may responses to the police which would signify guilt. *Id.*

The trial court denied the three defendants' motions for judgment of acquittal. It did so correctly only if the evidence permitted a reasonable mind to fairly conclude, beyond a reasonable doubt, that each of the three appellants knew of the existence of a loaded pistol in the bedroom nightstand; even if the evidence did permit the jury to infer such knowledge, we must assure ourselves that the evidence supported the further conclusion, also beyond a reasonable doubt, that each defendant exercised a right to dominion or control over the loaded pistol—that each had some appreciable ability to guide its destiny.

Appellants Jones and Washington were both present in Apartment Four when the loaded pistol was seized; appellant Curry was not. Because Curry's defense bore little or no resemblence to those of her codefendants, we discuss it separately.

### Appellant Curry

 The evidence against Curry was insufficient to convict for the offenses of possession of an unregistered firearm or unlawful possession of ammunition. A reasonable mind could not fairly conclude, beyond a reasonable doubt, that Curry had constructive possession of the loaded pistol which was found in the bedroom nightstand.

The government's initial burden was to present evidence sufficient to show beyond a reasonable doubt that Curry knew of the existence of the loaded pistol. The government did not carry that burden, which in this case was a heavy one because Curry did not have exclusive access to the apartment. Even if others had not been present during Curry's absence, a reasonable mind could not fairly conclude, beyond a reasonable doubt, that Curry knew of the existence and location of the weapon. Curry's fingerprints were not found on the gun. Her temporary and intermittent use of Apartment Four was shared with Jones and Washington, both of whom appear to have had keys and one of whom paid the rent. In the absence of evidence linking Curry to a concert of criminal activity of which the loaded pistol was a part, her tenuous and shared connection to the apartment must create a reasonable doubt that Curry was in possession of an illegal item which could have been placed in the bedroom nightstand unbeknownst to her. Both Jones and Washington also had access to the apartment; Curry stayed there only sporadically; there was no evidence that Curry slept there the previous night;

and Curry's last visit to Apartment Four some five hours previously was apparently a fleeting one for the purpose of changing her clothes.

The government's argument is even less convincing on the facts of this case, where several people were actually seen in the apartment during Curry's absence prior to the raid. Even if Curry had been the sole, full-time resident of the apartment, her absence at the time the loaded pistol was seized, at which point many others were present, compels a reasonable doubt that Curry knew of the presence of a loaded pistol in her bedroom nightstand. Both Jones and Washington were in Apartment Four, with three other people, when the loaded pistol was found during a raid on a large-scale drug distribution operation. Curry, on the other hand, was not shown to have been in the apartment at any point during the preceding five-hour period. Although the loaded pistol was found in the bedroom nightstand amongst her clothes, a reasonable mind must concede the reasonable possibility that Jones, Washington, or any of the three others found in the midst of a drug distribution operation could have placed the weapon in the bedroom unbeknownst to its occupant.

The government failed to present evidence which could permit a reasonable mind to fairly conclude beyond a reasonable doubt that Curry knew of the loaded pistol in the bedroom nightstand. By the same token, the government failed to meet its additional obligation to present evidence sufficient to establish that Curry had some appreciable ability to guide the destiny of the weapon—a weapon whose very existence may well have been outside her ken.

### Appellants Jones and Washington

■ Our conclusion is the same with respect to Jones and Washington. These two were similarly situated with respect to the government's theory that they constructively possessed the weapon so, for convenience, we treat their cases together.

Both Jones and Washington had access to Apartment Four, and one even paid the rent, but neither appears to have slept there. Although they were not mere visitors to the apartment, they were not residents either. Neither had exclusive access. Accordingly, they cannot be held accountable for the apartment's illegal contents without some evidence linking them individually to the weapon as well as the drugs.

The loaded pistol was not in plain view; it was found amongst women's clothing in a nightstand in the bedroom. The bedroom was occupied by Curry, who acknowledged intermittently "crashing" there for the two weeks leading up to the raid. Although quantities of drugs, to which Jones and Washington were connected, were seized from various locations in the bedroom, no drugs were found in the nightstand with the loaded pistol and Curry's clothing. Neither Jones nor Washington was observed in the bedroom at any time and the gun did not carry their fingerprints.

Jones and Washington were found to be involved in a concert of illegal activity consisting of drug distribution. But the evidence did not show that the loaded pistol was part of that operation. Expert testimony that drug dealers typically set up "a security system" to protect a "house" does not permit a blanket inference that a gun, which could have belonged to any of several people, including the apartment's only occupant, comprised such a security system. Apart from the bedroom's absent occupant, there were three others present in the apartment when the gun was found. One of these showed signs of guilt by attempting to flee when the police arrived.

This evidence, viewed in its most favorable light, does not permit a reasonable mind to fairly conclude beyond a reasonable doubt that either Jones or Washington, or both, knew of the existence of a loaded pistol in the bedroom nightstand. A reasonable mind must have a reasonable doubt because Curry, amongst whose personal belongings the weapon was apparently found, or any of the three others present

during the raid could have placed the loaded pistol in the bedroom nightstand unbeknownst to the two male appellants. Having failed to present sufficient evidence as to knowledge, the government necessarily failed also to present sufficient evidence that Jones and Washington exercised a right to dominion or control over the loaded pistol. On both counts, the evidence was insufficient to sustain Jones' and Washington's convictions for possession of an unregistered firearm and unlawful possession of ammunition.

The evidence presented by the government was capable of a number of equally plausible interpretations, only one leading to a guilty verdict. A reasonable juror could not conclude guilt without crossing the bounds of permissible inference and entering the forbidden territory of conjecture and speculation. To some jurors it might be *probable* that Curry, Jones or Washington possessed the loaded pistol seized from the nightstand, but probability is not a legally sufficient basis upon which to convict of a criminal offense. The government carries the constitutional burden of persuading the factfinder, *beyond a reasonable doubt*, that each of the accused committed every element of the offenses with which they were charged. Because the government did not present the factfinder with evidence sufficient to reach that conclusion, the convictions for possession of an unregistered firearm and unlawful possession of ammunition cannot be sustained.

### III

Jones and Washington raise several objections to their convictions for possession

of heroin with intent to distribute and possession of cocaine with intent to distribute. Both contend that the prosecutor engaged in prejudicial misconduct during closing argument. Jones maintains that certain testimony regarding the "Seal-a-Meal" device was improperly admitted and that the trial court erroneously denied a curative instruction once it recognized the inadmissibility of that testimony; he claims also that the trial court erroneously denied his motion to suppress the evidence seized from the apartment pursuant to the search warrant. Washington argues that certain testimony given by the handwriting and narcotics experts should have been excluded because it was conclusionary and outside their fields of expertise; he says also that the trial court erroneously denied his requested instructions limiting the use of prior uncharged criminal conduct evidence and elucidating his theory of the case. We agree that some of these contentions have merit. However, in view of the strong evidence against Jones and Washington on the drug charges, we conclude that the errors did not affect the verdicts and that reversal is not warranted.[6]

 Jones and Washington both complain that the prosecutor should not have referred to their trial counsel by name during closing argument; in the circumstances of the three-defendant trial that took place here, we see no misconduct on that ground. They maintain also that the prosecutor engaged in misconduct by pointing to government evidence which the defense "did not want to get near." In our

---

**6.** Two contentions may be disposed of briefly. The trial court did not err, as Washington alleges, in permitting the government's handwriting and narcotics experts to testify within their fields of competence. *Payne v. Soft Sheen Products, Inc.,* 486 A.2d 712, 726–27 (D.C.1985); *Dyas v. United States,* 376 A.2d 827, 831–32 (D.C.), *cert. denied,* 434 U.S. 973, 98 S.Ct. 529, 54 L.Ed.2d 464 (1977). Second, although the motions court erroneously found that Jones did not have standing to attack the validity of the search warrant (on the mistaken ground that he did

not have a reasonable expectation of privacy in the apartment), it also considered his challenge upon the merits and properly found the warrant valid. The affidavit upon which the warrant was based showed the existence of probable cause to believe that the contraband to be searched for and seized was located on the property to which entry was sought. U.S. Const. amend. IV; *see Zurcher v. Stanford Daily,* 436 U.S. 547, 554–56, 98 S.Ct. 1970, 1975–76, 56 L.Ed.2d 525 (1978).

view, this remark in itself does not constitute misconduct.

■ There were other aspects of the prosecutor's rebuttal argument, however, which do warrant comment. The first came in response to an argument by Jones' counsel that the police officers, upon finding nothing when they arrived to execute the search warrant, "planted" the drugs in the apartment. The prosecutor was fully justified in pointing out that the defense had produced no evidence whatever in support of this claim and in inviting the jury to reject the allegation as unfounded. *Tillman v. United States*, 487 A.2d 1152, 1154 (D.C.1985). The prosecutor overstepped the bounds of acceptable advocacy, however, by proceeding to make the sweeping assertion that "[w]hen a lawyer argues plant, there is nothing left." That a certain defense theory is unsupported by the evidence in a particular trial does not give the prosecutor carte blanche to suggest that the theory advocated is commonly recognized as a dubious defense which implies guilt as much as innocence. This remark took place during the prosecutor's rebuttal argument, just before the jury received its instructions and retired to deliberate upon its verdict. Defense counsel, therefore, had no opportunity to counter any prejudice caused.

■ Neither Jones nor Washington objected at trial to the comments complained of here, so that any prosecutorial misconduct must amount to plain error to warrant reversal. The plain error test is met if the comments "were so clearly prejudicial to substantial rights of [the] appellant[s] as to jeopardize the very fairness and integrity of the trial." *Arnold v. United States*, 467 A.2d 136, 137–38 (D.C. 1983); *McCowan v. United States*, 458 A.2d 1191, 1196 (D.C.1983). The evidence against Jones and Washington on the drug charges was not only weighty, but also uncontested on any significant issue; moreover, in discussing the evidence, the trial court instructed the jury that "statements of counsel are not evidence, questions by counsel are not evidence, arguments by counsel are not evidence." In the circumstances of this case, the government's rebuttal did not jeopardize the very fairness and integrity of the trial. There was no plain error.

■ Another contention deserves mention. The "Seal-a-Meal" device found in Apartment Four during the search was introduced into evidence. This appliance was directly linked to Jones by virtue of his thumbprint. The probative value of the device, which seals the edges of plastic sheets, lay in the narcotics expert's testimony that it could be used to package drugs for street sale.

Jones does not suggest that the "Seal-a-Meal" appliance was itself improperly introduced. His contention, consistent with an objection at trial, is that the police officer who seized the "Seal-a-Meal" device should not have been allowed to testify that eighteen months after the raid took place he noticed "little specks of powder" or "white particles" on the appliance. The officer was also permitted to testify that these particles had been chemically tested, but not allowed to reveal the results of the analysis. Although properly excluding the white particles from evidence on chain-of-custody and integrity grounds—the government sought to introduce them along with their chemical analysis—the trial court refused to strike the police officer's testimony or to give the jury a limiting instruction. Instead, the trial court ruled that the government would not be permitted to argue that the white particles were heroin or cocaine and that the defense would be permitted to argue that they were not.

The trial court erroneously exercised its discretion. *See Johnson v. United States*, 398 A.2d 354 (D.C.1979). In order for evidence to be admissible, its relevance must outweigh its prejudicial impact. Having found inadmissible both the white particles and the results of their laboratory analysis, the trial court should also have excluded all

testimony concerning their existence and the fact that they had been tested.

Evidence is both relevant and material if it has some logical tendency to prove or disprove a fact which is at issue in the trial. *See generally* McCORMICK ON EVIDENCE 185 (3d ed. 1984). The chain-of-custody and integrity problems which rendered the white particles inadmissible necessarily stripped testimony concerning their existence and testing of any probative value. Testimony merely describing excluded evidence—itself inadmissible due to its failure to meet basic evidentiary safeguards designed to ensure reliability—has no logical tendency to prove or disprove a fact in dispute.

Despite its *legal irrelevance*, information that white particles were found on the "Seal-a-Meal" device eighteen months after it was seized, and that those particles had been chemically tested, was bound to prejudice the jury against Jones and, by association, Washington. In the context of this case, where heroin and cocaine were found throughout Apartment Four, it was a natural, if impermissible, inference that the white particles were controlled substances and that they were on the appliance when it was seized. Because the testimony had prejudicial value, and no probative value, it should have been stricken, further testimony on the issue prohibited, and the requested curative instruction given. *Brooks v. United States*, 396 A.2d 200, 205–06 (D.C.1978); *Macklin v. United States*, 133 U.S.App.D.C. 347, 349, 410 F.2d 1046, 1048 (1969); *Frank v. United States*, 104 U.S.App.D.C. 384, 386, 262 F.2d 695, 687 (1958).

Finally, Washington complains that he was erroneously denied requested jury instructions. He contends that records of drug transactions in which he was involved prior to the raid, some in his own handwriting, demonstrated prior uncharged criminal conduct admissible only for the limited purpose of showing his intent to distribute the drugs seized. *Drew v. United States*, 118 U.S.App.D.C. 11, 15–

16, 331 F.2d 85, 89–90 (1964). Assuming that Washington is correct, an issue we do not decide, he would have been entitled to the instruction that these records could be considered only for that limited purpose and not as evidence of his propensity to commit the crimes charged. *Miles v. United States*, 374 A.2d 278, 283 (D.C.1977); *see also* Criminal Jury Instructions for the District of Columbia, No. 2.49 (3rd ed. 1978).

Washington also contends that he was erroneously denied a requested instruction on his theory of the case—that of innocent presence in the vicinity of illegal substances. This latter instruction should have been given, because the circumstantial nature of the government's case put evidence before the jury upon which Washington's theory, however weak, might have succeeded. *Jenkins v. United States*, 506 A.2d 1120, 1123 (D.C.), *cert. denied*, —— U.S. ——, 107 S.Ct. 160, 93 L.Ed.2d 99 (1986); *(Dwayne) Powell v. United States*, 414 A.2d 530, 532–33 (D.C.1980); *see also* Criminal Jury Instructions for the District of Columbia, *supra*, No. 5.01 (note). In calculating any resulting prejudice, however, we note that the standard instructions on constructive possession delivered by the trial court did set forth his theory, Criminal Jury Instructions for the District of Columbia, *supra*, Nos. 3.11, 4.32, although without the additional highlighting a separate instruction would have given. We note also that innocent presence was fully argued to the jury by his counsel.

The errors we have indentified—inadmissible testimony concerning the white particles and the fact that they had been chemically tested, the denial of Washington's requested instruction on his theory of the case, and our reservations concerning the prosecutor's rebuttal argument—coupled with the error we have assumed—the denial of an instruction limiting use of the records—were harmless in the circumstances of this case. The errors did not go to the core of the government case and any impact they may have had upon the trial does not outweigh the strong evidence linking Jones and Washington to the drugs.

Jones paid the rent on Apartment Four, both Jones and Washington had keys, and both were present in the apartment when the raid took place; drugs were seized in quantities and packaging suggestive of distribution; that drug distribution was in progress was also suggested by the red ribbon on the door and the arrival of an unsuspecting visitor carrying a bag full of unused syringes; heroin was found in Jones' wallet, and Washington made furtive movements against police instructions while seated on a couch from which heroin was immediately retrieved; Jones' thumbprint was recovered from the "Seal-a-Meal" device, an appliance suggestive of drug packaging which was properly admitted into evidence; the "Seal-a-Meal" device and the radio scanner receiving police broadcasts were both in plain view; Jones and Washington jointly kept extensive records, in their own handwriting, of a large-scale drug distribution operation; and neither Jones nor Washington offered any evidence tending to undermine the government's constructive possession theory in any material respect. The strength of this incriminating evidence permits us to say, with fair assurance, after pondering all that happened without stripping the erroneous actions from the whole, that the verdicts against Jones and Washington were not substantially swayed by the errors. *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946); *Jenkins v. United States, supra*, 506 A.2d at 1124.

We reverse the convictions of all three defendants for possession of an unregistered firearm and unlawful possession of ammunition. We affirm the convictions of Jones and Washington for possession of heroin with intent to distribute and possession of cocaine with intent to distribute.

*No. 84–610 reversed; Nos. 84–661 & 84–867 affirmed in part and reversed in part.*