In the Matter of T.M., Appellant.

In the Matter of J.T.M., Appellant.

Nos. 88–887, 88–892 *.

District of Columbia Court of Appeals.

Argued April 5, 1990.
Decided July 16, 1990.

Shirin Ikram, for appellant T.M.

David Rosenthal, for appellant J.T.M.

Charlotte M. Brookins, Asst. Corp. Counsel, with whom Herbert O. Reid, Sr., Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, were on the brief, for appellee District of Columbia.

Before ROGERS, Chief Judge,
SCHWELB, Associate Judge, and
GALLAGHER, Senior Judge.

SCHWELB, Associate Judge:

This is an unpleasant and melancholy case involving teenagers, guns, a huge stash of crack cocaine, some truly bizarre rental arrangements, and a productive search pursuant to a warrant. It had its inception in a justified and court-approved police intrusion into what used to be known as an Englishman's castle, effected with the aid of that unrelenting law enforcement tool for securing entry into crack houses and other establishments of like ilk, the battering ram. Following a joint trial, T.M. and J.T.M., both juveniles, were adjudicated delinquent for possession of an unregistered firearm, D.C.Code § 6–2311 (1989), and unlawful possession of ammunition, id. § 6–2361. They were acquitted of possession of cocaine with the intent to distribute it. Id. § 33–541 (1988). On appeal, both juveniles argue that the evidence was insufficient to support the finding of guilt of the firearm and ammunition charges. We reverse.

I

At trial, the prosecution adduced evidence that in April 1988, Francis S. James was the sole tenant of apartment 406 at 2705 Thirteenth Street in northeast Washington, D.C.[1] The apartment has a living room and two bedrooms. On or about April 3, 1988, he "rented" the apartment to "Jobba" (to whom he had been introduced

* This case was submitted on April 5, 1990.

1. Mr. James testified for the prosecution pursuant to a grant of immunity. He claimed through counsel that he apprehended reprisals for testifying and that he was in grave danger. The trial judge repeatedly indicated his displeasure with and disbelief of this witness, and warned him of the possibility of prosecution for perjury. Mr. James was the source of all of the evidence in the case except for the observations of the officers who executed the search warrant.

by a neighbor named "Terry") for an indefinite period. The rent was to be twenty-five dollars. Mr. James related that he then left and did not return until April 9. On that day, he again "rented" the apartment, this time to T.M. and J.T.M. for twenty-five dollars, and to "Chris" and "Russ" for twenty-five dollars and some cocaine. That was the first time he met T.M. and J.T.M.

Mr. James testified that at one point on April 9 he left the apartment for a brief period. When he returned, Russ opened the door, which led into the living room. Mr. James observed a .357 magnum in Russ' waistband. He also saw a sofa which had a .45 pistol lying on one end and J.T.M. asleep on the other.[2] Mr. James testified that he told an older person in the room to remove the guns. Mr. James left later that day to stay with a girl friend.

On April 12, 1988, officers executed a search warrant at Mr. James' apartment. They entered the apartment by using a battering ram. Finding no one in the living room, they proceeded to the middle bedroom. Near the wall of that bedroom, in front of the closet, the officers saw a closed oatmeal box, which was later found to contain 129 bags of cocaine. On a television tray next to the window, there was a pie plate with some white powder and a razor blade on it; the powder field-tested positive for cocaine. Later analysis would reveal a fingerprint on the pie plate which belonged to one of the persons found in the bedroom, but not to either of the appellants. The officers also saw a firearm, subsequently identified as a .45 pistol, lying on top of an open overnight bag in front of the closet, next to the oatmeal box. The pistol was not loaded. A clip of .45 ammunition, containing seven rounds, was observed lying next to the pistol. Another clip with four rounds was lying about two feet away.

There were six people in the middle bedroom, including a girl in her teens who had hidden in the bedroom closet. The five who were in the bedroom itself included T.M. and J.T.M. Two officers testified that when they entered the bedroom, the occupants were attempting to hide underneath blankets and clothes that were strewn about the room. All five were approximately the same distance from the pistol, but there was at least one person between J.T.M. and the weapon.

The entire apartment was described as "messy," with items of clothing scattered on the floor. A search of the living room revealed a loaded .357 magnum and several bags of crack cocaine. In the rear bedroom, the officers found a seventh person and several rounds of .22 ammunition.

At trial, T.M. and J.T.M. offered a photograph which was identified as having been taken by a police crime scene photographer.[3] The picture showed the open gym bag with a shaving kit lying where one of the government's photographs had shown the pistol to be; no weapon was visible in the respondents' picture. In addition, in the respondents' photograph, the oatmeal box was uncovered, contrary to the government's photographic evidence and the testimony of the government agents. During the government's case-in-chief, the photograph was used to impeach an officer who had related that nothing had been moved before the pictures were taken.

The judge found the evidence sufficient to prove guilt on the weapon and ammunition charges, but not with respect to the drugs:

> I find each of these defendants [sic] on the basis of their location in that room, when the police came in and the gun being in plain sight and within easy access of anybody in that room, to be guilty of possession of a gun that had not been registered as required by law.

---

2. Cross-examination revealed that Mr. James had apparently made a pretrial statement in which he did not mention that J.T.M. was asleep. The prior inconsistent statement could not, however, be considered as evidence of the truth of its contents. *Johnson v. United States,* 387 A.2d 1084, 1085 (D.C.1978) (*en banc*); *Lofty*

*v. United States,* 277 A.2d 99, 101 (D.C.1971). *But see generally* E. CLEARY, MCCORMICK ON EVIDENCE § 251, at 744–47 (3d ed. 1984) (criticizing traditional rule).

3. Neither appellant presented any testimony.

I find them not guilty of the charge of possession of cocaine with the intent to distribute it.

I find them also guilty of possession of ammunition that would fit that .45, because it's shown there in the picture.

\* \* \* \* \* \*

Having heard the evidence, the Court finds the respondents guilty of possession of a gun that had not been registered as required by law, and possession of ammunition to fit a gun that was not registered as required by law.

## II

Section 6–2311(a) makes it unlawful, with additions and exceptions not here relevant, for any person to "possess" or "have under his control" any unregistered firearm. Section 6–2361 contains a similar prohibition against possession of ammunition for a weapon which has not been registered. The question here presented is whether the evidence was sufficient to prove beyond a reasonable doubt that each appellant possessed the pistol and ammunition, or had these items under his control, as required by sections 6–2311(a) and 6–2361.

In evaluating appellants' claim of evidentiary insufficiency, we must consider the evidence in the light most favorable to the government, giving full play to the right of the judge, as the trier of fact, to determine credibility, weigh the evidence, and draw reasonable inferences. *Irick v. United States*, 565 A.2d 26, 30 (D.C.1989); *Langley v. United States*, 515 A.2d 729, 731 (D.C.1986). The government is entitled to the benefit of all reasonable inferences from the evidence, nor may any distinction be drawn between direct and circumstantial evidence. *Irick, supra*, 565 A.2d at 30; *Driver v. United States*, 521 A.2d 254, 259 (D.C.1987). Moreover, the evidence need not compel a finding of guilt or negate every possible inference of innocence. *Ir-*

*ick, supra*, 565 A.2d at 30–31. We will reverse on insufficiency grounds only when the government has failed to produce evidence upon which a reasonable mind might fairly find guilt beyond a reasonable doubt. *Langley, supra*, 515 A.2d at 731. These principles apply to appeals not only of criminal convictions but also of adjudications of juvenile delinquency. *See, e.g., In re B.E.W.*, 537 A.2d 206, 207 (D.C.1988).

In the present case, there was no evidence that the pistol or ammunition ever came into the actual possession of either appellant. The government's case must therefore stand or fall on a theory of constructive possession, and the trial court based his finding of guilt squarely on that elusive concept.[4]

In *Bernard v. United States*, 575 A.2d 1191, 1195 (D.C.1990), we recently had occasion to summarize as follows the basic principles applicable to the doctrine of constructive possession:

> No proof of actual possession of cocaine having been offered, the government's case against both men must rest on the theory that they constructively possessed this drug. To establish constructive possession, it is not sufficient for the prosecution to show that appellants were within reach of the drugs; mere proximity to an illegal item is not enough. *Curry v. United States*, 520 A.2d 255, 263 (D.C.1987). Rather, the government must establish that appellants knew of the location of the cocaine and that they exercised dominion and control over it. *Brown v. United States*, 546 A.2d 390, 394 (D.C.1988). Specifically, the prosecution was required to prove that each appellant knowingly had both the power and the intention at a given time to exercise dominion or control over the cocaine. *Brown, supra*, 546 A.2d at 394 n. 2 (quoting standardized jury instruction); *United States v. Cousins*, 427 F.2d 382, 384 (9th Cir.1970).[5]

---

4. "The more cases one reads on constructive possession, the deeper is he plunged into a thicket of subjectivity." *United States v. Holland,* 144 U.S.App.D.C. 225, 227, 445 F.2d 701, 703 (1971) (Tamm, J., concurring).

5. Some of our cases do not explicitly specify that intent to guide the destiny of the contraband is an element of constructive possession, although the point may be implicit in decisions, such as *Curry, supra,* which hold that proximity to an illegal item is not enough. 520 A.2d at

Although we are dealing here with a weapon and ammunition, the mode of analysis remains the same. *See Jefferson v. United States,* 558 A.2d 298, 304 (D.C.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 748, 107 L.Ed.2d 765 (1990).

## III

Applying the foregoing principles to the present case, we conclude that the government did not present sufficient evidence of T.M.'s and J.T.M.'s constructive possession of the .45 pistol and the ammunition to support their adjudications. The judge, as we have noted, predicated his finding of guilt on "the gun being in plain sight and within easy access of anybody in the room." He did not expressly find that either appellant had the intent to guide the destiny of the weapon or the live rounds. Indeed, he did not allude to that question at all.[6] We think that the evidence, when viewed in the light most favorable to the government, falls short of demonstrating beyond a reasonable doubt that J.T.M. or T.M. harbored such an intent.

The juvenile appellants were two of six persons roughly equidistant from the contraband when the police burst into the apartment. Although, like the other occupants of the room, they were sufficiently close to the pistol and ammunition to enable the judge to conclude beyond a reasonable doubt that they knew that these items were there, and that they had the power to exercise dominion over them, the proof here will take the government no further than that.

The only direct evidence of either appellant's association with the contraband was Mr. James' testimony that three days before the police raid he had observed J.T.M. allegedly asleep on a sofa with a .45 pistol lying on the other end. Mr. James, however, resisted the prosecutor's attempt to persuade him to tell the court that the pistol belonged to, or was being used by, this appellant.[7] Indeed, there is no conclusive evidence that it was the same pistol, and J.T.M. was charged with possessing a pistol on the day the search warrant was executed, not at some previous time.

The circumstantial evidence in this case is likewise too sparse to link either appellant sufficiently to the weapon and the ammunition. We have held that constructive possession may be established by an

---

263. *Cf. Logan v. United States,* 489 A.2d 485, 491 (D.C.1985). The intent requirement is made explicit in District of Columbia Jury Instruction No. 3.11 (3d ed. 1978), quoted in *Brown, supra,* 546 A.2d at 394 n. 2, and cited in *DeNeal v. United States,* 551 A.2d 1312, 1317 (D.C.1988). It is similarly recognized in a plethora of cases from other jurisdictions. *See, e.g., United States v. Dugan,* 477 F.2d 140, 141 (8th Cir.1973); *United States v. Cousins,* 427 F.2d 382, 384 (9th Cir.1970); *United States v. Wolfenbarger,* 426 F.2d 992, 994–95 (6th Cir.1970); *Barnes v. United States,* 341 F.2d 189, 192 n. 5 (5th Cir.1965) (dictum); *United States v. Curzio,* 170 F.2d 354, 357 (3d Cir.1948); *Nelson v. State,* 628 P.2d 884, 889 (Alaska 1981); *State v. Dittman,* 569 S.W.2d 363, 365 (Mo.Ct.App.1978) (en banc); *State v. Minor,* 290 N.C. 68, 72, 224 S.E.2d 180, 184 (1976); *Commonwealth v. Stasiak,* 305 Pa.Super. 257, 265, 451 A.2d 520, 524 (1982); *State v. Kimbrell,* 294 S.C. 51, 53, 362 S.E.2d 630, 631 (1987). In *Bernard, supra,* we removed any doubt that we adhere to this line of authority.

6. In fairness to the judge, we note that he was not required, in the absence of a request from counsel, to make more than a general finding as to whether each appellant was not guilty or guilty. Super.Ct.Juv.R. 31(a); *see In re R.D.J.,* 348 A.2d 301, 304–05 (D.C.1975) (*per curiam*). It may well be that the brief explanation which the judge provided for his ruling was not designed to be exhaustive. In any event, we think the evidence insufficient as a matter of law, and do not predicate our decision on the permissible brevity of the judge's explanation.

7. Mr. James stated that on April 9, when he saw Russ with a .357 magnum in his pants and a .45 on the sofa, he told "one of the older guys to take those guns from the guy that opened the door for me [Russ] and get the one off the sofa, take him and do something with him." The attorney for the District and the witness then had the following exchange:

Q And you told him to take the gun away from Prince [J.T.M.]?

A Well, I didn't tell him to take it away from Prince, I told him to take it away from Russ and get the one off the sofa.

Q No, just a second ago I said to you—you said you asked him to take them away from the kids.

A That's just a figure of speech, "kids" because I don't know who had the guns; one person was on the sofa sleep [sic] and the gun was on the far end. So, I can't say that was his gun or not.

accused's proximity to the prohibited item coupled with "circumstances giving rise to an inference of a concert of illegal action involving [the contraband] by the occupants of the premises where the [contraband was] found." *Wheeler v. United States,* 494 A.2d 170, 173 (D.C.1985); *accord, Thompson v. United States,* 567 A.2d 907, 909 (D.C.1989). There must, however, be evidence linking the accused to the ongoing criminal operation. *Wheeler, supra,* 494 A.2d at 173; *see also United States v. Covington,* 459 A.2d 1067, 1071 (D.C.1983).

In the present case, appellants were both acquitted of the drug charges. Although the circumstances were suspicious to say the least—there was no readily apparent reason for appellants to be in the apartment except in connection with the contraband—there was no proof that either of them had any personal role in the handling of the cocaine or in the distribution for which it had obviously been prepared. There was similarly no evidence that T.M. and J.T.M. had any prior association with the other persons in the apartment.[8] One might reasonably infer from the evidence at hand that appellants did not pay for the privilege of staying in the apartment in order to have a convenient place for choir practice. We do not believe, however, that the not very flattering milieu in which

these two juveniles were found is enough to establish beyond a reasonable doubt—the most exacting standard of proof known to our law—that either of them had the necessary personal relationship to the weapon and ammunition.

The government contends that the appellants' attempt to hide—*i.e.,* to put the bed clothes over their heads—when the police entered the apartment constitutes evidence of their involvement in a criminal operation. It is difficult, however, to make much of a case for the proposition that these juveniles' attempt to scurry under clothes and blankets when unknown persons had just noisily broken down the door with a battering ram made it more probable, directly or indirectly, that they had the intention to control the destiny of the pistol and ammunition.[9] Their actions were a far cry from the elusive activity in *Thompson,* where the appellant hid behind a doorway while the police were questioning his juvenile companion. *See Thompson, supra,* 567 A.2d at 909. The scamper under the bedclothes likewise did not approach the more calculated and dispositive act of eliminating evidence by flushing suspected contraband to oblivion down the toilet before police could recover it. *See Wheeler, supra,* 494 A.2d at 173. Courts have frequently alluded to the ambiguity of evidence relating to "furtive gestures"[10] and

---

**8.** Although, according to Mr. James, appellants had paid him $25 for the privilege of staying in his apartment, and were thus technically sub-tenants, and although they had allegedly been there three days, there is no evidence that appellants were more than comparatively short-term visitors to the unit. The government offered no evidence that they had clothes or personal papers there. This might perhaps cut both ways—while it tends to negate appellants' long-term connection with the premises, it might imply that they were there for activities less benign than conventional residency—but we should heed a counsel of caution as to what may properly be inferred from such facts in a case in which proof beyond a reasonable doubt is required. As the court stated in *United States v. Holland,* 144 U.S.App.D.C. 225, 227, 445 F.2d 701, 703 (1971) (footnote omitted) (a case in which the appellant had clothes in a closet and a drawer),

> [w]e must remember that constructive possession means being in a position to exercise dominion or control over a thing. Such a

position should not be lightly imputed to one found in another's apartment or home.

Mr. James admitted that ammunition found in another room belonged to him, and he testified that he saw persons other than appellants with a weapon and with the oatmeal box from which drugs were subsequently recovered.

**9.** If anyone's "flight or concealment" realistically reflected consciousness of guilt, it was surely the girl who hid in the closet.

**10.** *See, e.g., Jones v. United States,* 391 A.2d 1188, 1191 (D.C.1978). As the court stated in *People v. Superior Court,* 3 Cal.3d 807, 817–18, 91 Cal.Rptr. 729, 735, 478 P.2d 449, 455 (1970) (*en banc*),

> [w]e can posit that sudden efforts at concealment, like flight from the scene of a crime, may well be expressions of consciousness of guilt. On the other hand, the same motion may in fact have an entirely innocuous purpose: It is recognized that a person's reasons for concealment may run the whole spectrum

there is no indication that the judge considered the alleged self-concealment here.[11] Obviously, an appellate court lacks the direct "feel" for the evidence which is available to the trial judge, who sees live bodies and facial expressions rather than a cold transcript which may capture words while the heart and soul of the case elude it. Nevertheless, we conclude as a matter of law that the ambiguous kind of "furtive gesture" attributed to these appellants is simply insufficient here to put the prosecution over the top.

## IV

When stripped to its essence, the case against these appellants consists of their proximity to a pistol and ammunition in plain view in a sordid crack house, when both were found not guilty of any connection with the drugs. We hold that this is not enough to establish a sufficient association between the individual appellants and the weapon or the live rounds.[12] A contrary holding sustaining findings of guilt on the basis of proximity and a suspicious milieu would potentially criminalize innocent conduct and impermissibly compress the protections afforded the citizen by the presumption of innocence and the requirement of proof beyond a reasonable doubt. The adjudications of delinquency must be and each is hereby reversed, and both cases are remanded to the trial court with directions to enter judgments of acquittal.

*So ordered.*

from the most legitimate motives to the most heinous.

The difficulty is that from the viewpoint of the *observer,* an innocent gesture can often be mistaken for a guilty movement. He must not only perceive the gesture accurately, he must also interpret it in accordance with the actor's true intent. But if words are not infrequently ambiguous, gestures are even more so. Many are wholly nonspecific, and can be assigned a meaning only in their context. Yet the observer may view that context quite otherwise from the actor: not only is his vantage point different, he may even have approached the scene with a preconceived notion—consciously or subconsciously—of what gestures he expected to see and what he expected them to mean. The potential for misunderstanding in such a situation is obvious. (Citations, footnotes, and internal quotation marks omitted; emphasis in original).

**11.** In this connection, however, see note 6, *supra.*

**12.** This is not a case such as *Brown, supra,* 546 A.2d at 396–97, or *Waterstaat v. United States,* 252 A.2d 507, 509 (D.C.1969), in which it was held that the requisite inferences may be drawn from the location of weapons in plain view and substantially within a defendant's reach in the closer confines of an automobile.