**Clyde BROOKS, Sr., Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 94–SP–346.**

District of Columbia Court of Appeals.

Argued April 11, 1995.

Decided Dec. 12, 1996.

---

M.L. Armstrong, Public Defender Service, with whom James Klein and Sandra Levick, Public Defender Service, were on the brief, for the appellant.

Pamela S. Satterfield, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney, and John R. Fisher and Thomas J. Tourish, Jr., Assistant United States Attorneys, were on the brief, for the appellee.

Before FERREN and RUIZ, Associate Judges, and PRYOR, Senior Judge.

RUIZ, Associate Judge.

On March 18, 1994, Clyde Brooks obtained his first criminal conviction when a Superior Court judge presiding in landlord-tenant

court summarily held him in contempt because of his conduct and demeanor in court. Prior to adjudicating Mr. Brooks guilty and sentencing him to ten days in jail, the trial court neither appointed Mr. Brooks a lawyer, advised him of any pending charges, afforded him an opportunity to present a defense, nor permitted him to allocute in mitigation of his sentence. This procedure, we hold, did not comport with this court's interpretation of the District of Columbia Superior Court rules governing contempt proceedings. We also find that the evidence was insufficient to support the conviction. Accordingly, we reverse the conviction for contempt.

## I. THE FACTS

On March 15, 1994, Mr. Brooks and Carol Thomas were ordered to pay the rent on their apartment into a court registry pursuant to their landlord's action for eviction in *Home Realty, Inc. v. Carol Thomas and Clyde Brooks, Sr.,* landlord and tenant matter no. LT–7057–94. The first payment was due just three days later, on March 18, 1994, with monthly payments due on the fifth of each month thereafter. Having inadequate funds, Mr. Brooks and Ms. Thomas sought assistance from the D.C. Law Students in Court program, which directed them to various charities which, in turn, given at least two weeks' notice, might have been able to help the couple make its rent payments.

By March 18, 1994, it was apparent that the couple would need to seek an enlargement of time in which to make the payment into the court registry. Appearing in court without a lawyer, the couple first consulted with Ann Marie Hay, a supervisor at the D.C. Law Students in Court program. Responding to the couple's concern about the payment deadline, Ms. Hay approached the attorney for the landlord, who apparently acknowledged the tenants' request for an enlargement of time but did not consent to it. Thereafter, the matter was called, and following Mr. Brooks's explanation of the couple's current difficulties, the landlord's attorney stated in open court that the landlord opposed any extension of the rent payment deadline.

Mr. Brooks believed, either through his own unfamiliarity with legal proceedings or by the inadvertent indications of Ms. Hay, that the landlord would agree to the enlargement of time. The transcript suggests that as the landlord's attorney was announcing his position, Mr. Brooks undertook some gesticulation which caused the trial judge to interrupt the landlord's attorney for the purpose of reminding Mr. Brooks, "Sir! .... You're in a court of law. We're courteous to each other." Mr. Brooks voiced his acquiescence with the court's directive to be courteous, but responded that he "didn't say anything to" the landlord's attorney. Once the landlord's attorney was finished setting out his opposition to the additional time, the trial judge stated that she would hear from Mr. Brooks "very briefly" on the issue.

Mr. Brooks was clearly upset about what he felt had been the landlord's unexpected reversal. Mr. Brooks twice tried to start a response, but was interrupted each time by the judge's admonition to compose himself and to be calm. After promising that he had calmed down, Mr. Brooks explained his understanding that the landlord had consented to an extension. At the invitation of the court, Ms. Hay stated that Mr. Brooks misunderstood the situation and that she had not told him that the landlord's attorney would agree to his motion.[1] Mr. Brooks, at this point, believed that the landlord's attorney had "tricked" him into thinking the extension was unopposed, and said as much by exclaiming, "That was a trick!" This led the judge to announce she would pass the case, in order to allow Mr. Brooks "to calm down."

When the case was recalled following the disposition of another matter, Mr. Brooks twice apologized for his agitation, an apology which the judge appeared to accept. The trial judge then granted the couple's request for an enlargement of time, and directed a warning to Mr. Brooks that if he were to return to court "with that kind of attitude,

---

1. Ms. Hay did add that Mr. Brooks and Ms. Thomas would be consulting more fully with student counsel on the eviction matter the following Monday, but that an attorney-client conference on this day had not been possible because Mr. Brooks and Ms. Thomas were on their way to pick up their children from a half-day at school.

this Court will hold you in contempt and I will throw you into jail." Mr. Brooks was denied any other opportunity to speak in the proceedings, except to thank the court for its ruling.

As he was leaving the courtroom and a new case was being called, the judge overheard Mr. Brooks say that the landlord's management "need[s] to fix some of that shit in that apartment." At this comment, the judge turned from the proceedings she was conducting and announced to Mr. Brooks that "it's clear you don't understand." Mr. Brooks obliquely responded "I understood, Your Honor. You have no say so. That's what I understand." Mr. Brooks was then stopped as he was leaving the courtroom, and a United States Marshal was called. The trial judge, within two minutes, held Mr. Brooks in contempt of court and sentenced him to ten days in jail. The entire contempt proceeding follows:

THE COURT: Mr. Brooks, please state your name.

MR. BROOKS: Clyde Edward Brooks, Sr., Your Honor.

THE COURT: Very well. And, our record will reflect that Ms. Thomas is present. This does not concern Ms. Thomas. The Court had Mr. Brooks before her on two occasions, just about three occasions, this morning. The Court spoke with Mr. Brooks with respect to his conduct in the courtroom. The Court told Mr. Brooks that she would speak to him about the case in a calm manner. The Court warned Mr. Brooks that his demeanor was not proper for these proceeds [sic]. The Court had to call Mr. Brooks back into the courtroom because he used offensive and derogatory language in the courtroom. The Court explained to that Mr. Brooks, that was not appropriate. Mr. Brooks apologized to the Court. The Court made her ruling, in Mr. Brooks' favor, that was opposed by the plaintiff. Mr. Brooks left the courtroom and, again, used derogatory language. Sir, don't

say anything! The Court noted that the Court had to call this matter three times. It has certainly prevented the administration of justice. Others have had to sit in this courtroom to wait for their cases to be called. The Court has to take immediate action. And, if she doesn't take immediate action, this calendar will not move. The Court is gonna summarily hold Mr. Brooks in contempt of court. He will be required to serve ten days in jail. You may take him, Marshal.

MR. BROOKS: Oh, man!

[LANDLORD'S ATTORNEY]: Thank you, Your Honor.

MS. THOMAS: So—

THE CLERK: You're free to leave.

MS. THOMAS: Okay.

Four days after the hearing, the trial judge issued an Order of Contempt (appended hereto) in which she set forth the certification of facts upon which she relied to base her finding of contempt of court. Mr. Brooks petitioned both the trial court and this court on an emergency basis for a stay of the judge's order of commitment pending an appeal of his conviction.[2] Both requests were denied. Mr. Brooks then filed with this court a new emergency motion for release pending appeal, or in the alternative for rehearing *en banc* of his motion for a stay. This court denied both motions on the day they were filed.

For reasons that follow, we hold that the decision to employ a summary contempt proceeding under Rule 42(a) was inappropriate under the circumstances of this case and that the contempt conviction is substantively deficient, in that the elements of criminal contempt were not met. We first identify the standard of our review. Second, we address the propriety of employing a summary contempt procedure in this case. Finally, we will turn to the question whether the evidence on the record supports Mr. Brooks's conviction.

2. After Mr. Brooks sought counsel from the District of Columbia Public Defender Service, he moved the trial court six days after his incarceration to release him pending resolution of an appeal to this court. The trial judge denied that request, but modified Mr. Brooks's sentence to authorize work release during the service of his sentence. It appears, however, that the Department of Corrections never effectuated that modified order, and Mr. Brooks remained fully detained for the entire ten-day period.

## II. STANDARD OF REVIEW

■ Summary criminal contempt proceedings in which the trial judge was at once prosecutor, fact finder, and sole witness, require this court to undertake *de novo* review.[3] *See In re Kraut*, 580 A.2d 1305, 1311 (D.C.1990) (noting that "because of the inherent danger in one person's performing the potentially conflicting roles of prosecutor, judge, and jury," this court needs a clear record "on which to review [a judge]'s performance"); *In re Daniels*, 118 N.J. 51, 570 A.2d 416, 422, *cert. denied*, 498 U.S. 951, 111 S.Ct. 371, 112 L.Ed.2d 333 (1990) ("The provision for *de novo* appellate review of summary contempt convictions is a fail-safe mechanism for assuring that the contempt power is not abused."). This is the standard we apply in evaluating the contempt proceedings against due process requirements.

■ We must also determine whether the trial court properly proceeded under District of Columbia Superior Court Rule of Criminal Procedure 42(a), governing summary contempt proceedings, or should have proceeded under Rule 42(b), governing nonsummary contempt proceedings. The government states, without support from this court's precedents, that a trial court's decision that summary procedures were necessary is reviewed only for abuse of discretion. *See In re Holloway*, 302 U.S.App. D.C. 12, 18, 995 F.2d 1080, 1088 (D.C.Cir.1993), *cert. denied*, 511 U.S. 1030, 114 S.Ct. 1537, 128 L.Ed.2d 190 (1994). Our decisions, however, have clearly and consistently invoked a full and independent review of the record, because the applicability of particular court rules is a legal and not a factual or discretionary question. *See, e.g., Bethard v. District of Columbia*, 650 A.2d 651, 654–55 (D.C.1994); *McCormick v. United States*, 635 A.2d 347, 348–51 (D.C.1993); *Swisher v. United States*, 572 A.2d 85, 90–94 (D.C.1990); *In re Rosen*, 315 A.2d 151, 152–53 (D.C.), *cert. denied*, 419 U.S. 964, 95 S.Ct. 224, 42 L.Ed.2d 178 (1974).[4]

■ Finally, we consider whether the evidence was sufficient to sustain a conviction for criminal contempt. This inquiry entails questions of fact and questions of law. The trial court's findings of fact will not be disturbed unless "shown to be without evidentiary support or plainly wrong." *Bethard, supra*, 650 A.2d at 654. The question whether those acts constitute the crime of contempt, however, is a question of law that we independently review. *See In re Gorfkle*, 444 A.2d 934, 940 (D.C.1982) (judging appellant's actions to be noncontumacious without deference to the trial court's determination of that issue). "We review an appellant's contemptuous acts 'in light of the surrounding circumstances,'" *Bethard, supra*, 650 A.2d at 653 (quoting *In re Ellis*, 264 A.2d 300, 301 (D.C.1970)), gleaning those circumstances from the trial transcript, the contemporaneous recording of the proceedings, and the

---

3. Because the judge witnessed the disputed event, our review is different from cases where the trial court finds facts based upon evidence presented. We ordinarily defer to the trial judge where there are witnesses at the proceedings whose demeanor or credibility the trial court had the unique opportunity to assess. Here, Mr. Brooks's credibility was not at issue; he did not deny using the profanity. The question here was whether Mr. Brooks's actions and comments should have been interpreted as so disruptive of the court's calendar as to warrant a ten-day jail sentence. The sole witness against Mr. Brooks in this regard was the trial judge herself, whose participation in the events leading up to the contempt finding gives this court a heightened obligation independently to evaluate the appellant's conduct. *See Offutt v. United States*, 348 U.S. 11, 14, 75 S.Ct. 11, 13, 99 L.Ed. 11 (1954) ("[J]udges also are human, and may, in a human way, quite unwittingly identify offense to self with obstruction to law.").

4. This court did use an abuse of discretion standard in one case reviewing the summary contempt conviction under Rule 42(a) of a criminal defendant when that defendant failed to heed the court's repeated warning not to speak unless given permission. *Irby v. United States*, 342 A.2d 33, 41 (D.C.1975). It is not clear, however, what is intended by the court's use of "abuse of discretion" in that context; it is not, for example, apparent from the opinion whether the issue on appeal was a challenge to the court's proceeding under Rule 42(a) or was a challenge to the court's conclusion that the evidence was sufficient to convict. We additionally note that there is no suggestion in the *Irby* opinion that the trial court in that case issued a Rule 42(a) certification, thus casting doubt on the pertinence of that decision to this case.

trial court's Rule 42(a) certification. *In re Brown,* 320 A.2d 92, 92–95 (D.C.1974) (independently reviewing the record); *In re Gates,* 248 A.2d 671, 672–74 (D.C.1968) (employing both the transcript and the Rule 42(a) certification, the latter only to the extent uncontested by the appellant); *see also Warrick v. United States,* 528 A.2d 438, 443–44 (D.C.1987) (*Warrick I* ) (reversing conviction where trial court inadequately supplemented the record).[5]

■ This plenary review allows this court to consider on the one hand, whether the trial court's account of the disruptions Mr. Brooks allegedly created is supported by the record, and on the other hand, whether even if true, the facts as certified by the trial court met the elements of criminal contempt. We review the court's certification to determine whether (1) the record supports each finding of fact in the certification, and (2) the supported facts in the certification are sufficient to constitute criminal contempt. *Kraut, supra,* 580 A.2d at 1311–12, 1313–14; *Warrick I, supra,* 528 A.2d at 443–44. We may not uphold a conviction of criminal contempt on grounds other than those cited by the trial court in its contempt certification. *Kraut, supra,* 580 A.2d at 1313–14. We will also reverse a conviction for contempt if we find that there is not adequate record support for any certified fact, if that fact was part of an aggregate of facts upon which the trial judge based his or her contempt ruling. *See, e.g., In re L.G.,* 639 A.2d 603, 606–07 (D.C.1994); *Kraut, supra,* 580 A.2d at 1313–14. This is so even where individual acts for which there was evidentiary support could have independently sustained a contempt conviction, but the trial court relied on the aggregate in citing the individual for contempt. *L.G., supra,* 639 A.2d at 606–07.

## III. The Contempt Power

■ The ability of trial judges to hold individuals in contempt of court is well-established and fundamental to an orderly system of justice. *See generally Bloom v. Illinois,* 391 U.S. 194, 202–06, 88 S.Ct. 1477, 1482–84, 20 L.Ed.2d 522 (1968); *Cooke v. United States,* 267 U.S. 517, 534–35, 45 S.Ct. 390, 394, 69 L.Ed. 767 (1925); *Ex parte Terry,* 128 U.S. 289, 303, 9 S.Ct. 77, 79, 32 L.Ed. 405 (1888); *see also Swisher, supra,* 572 A.2d at 95 (Schwelb, J., concurring). " 'The power to punish for contempt is inherent in the nature and constitution of a court,' " not deriving from statute, but arising from the need to enforce compliance with the administration of the law. *Terry, supra,* 128 U.S. at 303, 9 S.Ct. at 79 (quoting *In re Cooper,* 32 Vt. 253, 257 (1859)). Rule 42 governs contempt proceedings in D.C. Superior Court; Rule 42(a) provides for summary contempt proceedings and Rule 42(b) provides for nonsummary contempt proceedings.

■ Where the affront to the court is a direct and visible one, Rule 42(a) allows a judge to punish a contemnor summarily "if the judge certifies that the judge saw or heard the conduct constituting the contempt and that it was committed in the actual presence of the Court." Direct contempt, which is an affront to the dignity and authority of the court, was traditionally punishable without the ordinary dictates of due process accorded those charged with other crimes. "There is a long history upholding summary adjudication including imprisonment for contempts 'committed in the face of the court.' " *Pitts v. State,* 421 A.2d 901, 905 (Del.1980)

---

**5.** The government contends that in reviewing the sufficiency of the evidence, this court must view "the evidence presented at trial 'in the light most favorable to the government.' " *Brief of Appellee* at 7 (citing *Parks v. United States,* 627 A.2d 1, 4 (D.C.1993); *Curry v. United States,* 520 A.2d 255, 263 (D.C.1987)). We note that because of the extremely summary nature of the proceedings, the government was not a party to the action in the trial court. *Compare Bethard, supra,* 650 A.2d at 654 (appeal from Rule 42(a) proceeding in which the District of Columbia Corporation Counsel participated). We thus assume that the government's proposal is that the evidence be viewed in the light most favorable to conviction. The rule requiring that the evidence be viewed in favor of the government, or in this case, conviction, results from our deference to the factfinder on issues of fact after an adversarial proceeding. For reasons set forth in this opinion, the procedure by which Mr. Brooks was convicted, where the court permitted no confrontation, defense, or allocution, could scarcely be termed an adversarial "trial" in the sense traditionally given by our Constitution. Thus, in these circumstances, there is no reason to indulge a view of the evidence favoring conviction. We adopt a neutral stance in evaluating the evidence of record.

(quoting 2 G. Sharswood, Blackstone's Commentaries, Book IV, ch. 20, p. 286 (1895) and citing *In re Oliver,* 333 U.S. 257, 267–72, 68 S.Ct. 499, 504–07, 92 L.Ed. 682 (1948); *Cooke, supra,* 267 U.S. at 534–35, 45 S.Ct. at 394; *Terry, supra,* 128 U.S. at 291–96, 9 S.Ct. at 78 (additional citations omitted)). It is generally accepted that summary contempt is a necessary and proper course to preserve the order essential to the functioning of the courts. *Swisher, supra,* 572 A.2d at 95 (Schwelb, J., concurring). "The pith of this rather extraordinary power to punish without the formalities required by the Bill of Rights for the prosecution of ... crimes generally, is that the necessities of the administration of justice require such summary dealing with obstructions to it." *Offutt v. United States,* 348 U.S. 11, 14, 75 S.Ct. 11, 13, 99 L.Ed. 11 (1954).[6]

 It is a long-settled principle that " '[s]ummary punishment always, and rightly, is regarded with disfavor.' " *Taylor v. Hayes, supra,* 418 U.S. at 498, 94 S.Ct. at 2703 (quoting *Sacher v. United States,* 343 U.S. 1, 8, 72 S.Ct. 451, 454, 96 L.Ed. 717 (1952) (alteration in original)). Observing this principle, the United States Supreme Court established a requirement restricting the application of Rule 42(a) that supplements the requirement that the judge certify that she saw or heard the contumacious act and that it was committed in her presence: the conduct complained of must be "so outrageous and disruptive" that it threatens the conduct of business in the courtroom and will not abate without immediate action. *See McCormick, supra,* 635 A.2d at 348, 350 (citing *Offutt, supra,* 348 U.S. at 14, 75 S.Ct. at 13); *Cooke, supra,* 267 U.S. at 534, 45 S.Ct. at 394; *Swisher, supra,* 572 A.2d at 96 (Schwelb, J., concurring). Summary contempt should be directed only at conduct that

"pose[s] such an open threat to the orderly procedure of the court, and such a flagrant defiance of the person and presence of the judge that, were it not instantly suppressed and punished, demoralization of the court's authority would follow." *Swisher, supra,* 572 A.2d at 91 (citing *Cooke, supra,* 267 U.S. at 536, 45 S.Ct. at 394–95). In essence, summary contempt under Rule 42(a) is restricted to those situations where, quite literally, the court's business cannot proceed unless punishment is imposed on a party whose contumacious acts are actively preventing the administration of justice. *McCormick, supra,* 635 A.2d at 350. Summary proceedings under Rule 42(a) are thus "reserved for 'exceptional circumstances,' " *id.* (citation omitted), and "should be exercised sparingly." *Warrick I, supra,* 528 A.2d at 443.

 As the court's certification states, at the time that Mr. Brooks made the statement that finally led the court to hold him in contempt, his case was over, and Mr. Brooks was leaving or had already left the courtroom. *See McCormick, supra,* 635 A.2d at 350 (reversing Rule 42(a) conviction where contumacious act occurred as sentencing hearing was concluded); *Warrick I, supra,* 528 A.2d at 443 (same). Mr. Brooks's departure disrupted no proceedings—indeed, the court heard and disposed of another L & T case prior to tending to the allegedly emergent Brooks contempt matter. *See Taylor v. Hayes, supra,* 418 U.S. at 498–99, 94 S.Ct. at 2703 (noting that the assertion that summary contempt was necessary "to preserve order and enable [the court] to proceed with its business" is difficult to sustain where trial court delayed summary contempt proceeding until the conclusion of the allegedly disrupted trial) (alteration in original).

Mr. Brooks's conduct, primarily a comment made incidental to and at the conclu-

---

6. Nonsummary contempt proceedings pursuant to Rule 42(b) are designed to address either conduct occurring outside the presence of the court, or conduct in the presence of the court where either no exigency exists or where the court lacks information sufficient to adjudicate the alleged contempt. This rule requires notice of the offense charged, which provides an opportunity to prepare and present a defense. Although Rule 42(b) does not so provide by its terms, proceedings under that section have been

held to require the assistance of counsel and an opportunity to allocute at sentencing. *Taylor v. Hayes,* 418 U.S. 488, 498–99, 94 S.Ct. 2697, 2703, 41 L.Ed.2d 897 (1974); *Groppi v. Leslie,* 404 U.S. 496, 504, 92 S.Ct. 582, 587, 30 L.Ed.2d 632 (1972); *Oliver, supra,* 333 U.S. at 273, 275, 68 S.Ct. at 507, 508–09; *Cooke, supra,* 267 U.S. at 538, 45 S.Ct. at 395; *In re Wiggins,* 359 A.2d 579, 581 & n. 5 (D.C.1976). In this case, the trial court proceeded against Mr. Brooks summarily under Rule 42(a).

sion of his L & T matter, was essentially different from conduct that impedes or addresses itself to an active proceeding. *Compare Offutt, supra*, 348 U.S. at 16–17 & nn. 2, 3, 75 S.Ct. at 14–15 & nn. 2, 3. Our cases upholding the use of summary contempt have consistently involved conduct that was so disruptive, or contrary to the court's orders, that the proceedings in which the contemnor was supposed to participate could not move forward without the court imposing some form of punishment, usually a fine. *See, e.g., In re (W. Edward) Thompson*, 454 A.2d 1324, 1328 (D.C.1982) (upholding fines of $300 and $200 imposed for repeated violations of court's restriction of the scope of trial evidence); *In re (Raymond B.) Thompson*, 419 A.2d 993, 995 (D.C.1980) (affirming in part and reversing in part three $100 fines for failing to appear in court); *In re Gregory*, 387 A.2d 720, 723 (D.C.1978) (upholding a $100 fine and a suspended sentence for failing to appear); *In re Schaeffer*, 370 A.2d 1362, 1363–64 (D.C.1977) (upholding $100 fine for failing to appear); *Gates, supra*, 248 A.2d at 677 (upholding two fines of $50 imposed for refusal to respond to questions court posed at arraignment); *see also Jessup v. Clark*, 490 F.2d 1068, 1071 (3d Cir.1973) ("[N]eed of immediate action to restore order to an ongoing proceeding is a prerequisite, both constitutionally and under Rule 42(a), to use of the summary contempt power.").[7] Because there was no actual disruption to his own case or to any other case pending in L & T court occasioned by Mr. Brooks's statement as he was leaving the courtroom, Mr. Brooks's case did not present any exceptional circumstances warranting the use of summary contempt under Rule 42(a).

■ The summary contempt rule is intended to preserve the ability of the court to conduct its business, *Warrick I, supra*, 528 A.2d at 443, and should be invoked only where a party has interfered with judges' "efforts to maintain an orderly system of justice and to keep abreast of their calendars." *Rosen, supra*, 315 A.2d at 153; *Gates, supra*, 248 A.2d at 677. The trial

court in this case, apparently recognizing the requirement that an alleged contemnor being prosecuted under Rule 42(a) actively disrupt ongoing proceedings, characterized Mr. Brooks's conduct as interfering with the court's calendar. *See supra* at [218] ("And, if [the court] doesn't take immediate action, this calendar will not move.") This assertion, however, is clearly erroneous. Like the appellant in *Warrick I*, whose summary contempt conviction we reversed, Mr. Brooks's alleged contumacious act occurred after the proceedings involving his case, "to all intents and purposes, had already ended." 528 A.2d at 443. Not only was Mr. Brooks no longer participating in any proceedings before the court when the court decided to hold him in contempt; the judge continued to hear other L & T matters both before and after he made the remark that prompted the judge to hold him in contempt. Under these circumstances, we hold that whatever disruption Mr. Brooks might have caused, did not rise to the level of "exceptional circumstances" that would justify using the generally disfavored summary contempt procedure.

■ Following Supreme Court guidance, this court has required that a judge offended by an act perceived as contumacious explore and reject all less restrictive alternatives to summary contempt prior to proceeding under Rule 42(a). *Bethard, supra*, 650 A.2d at 655 n. 12; *Swisher, supra*, 572 A.2d at 94; *see also United States v. Wilson*, 421 U.S. 309, 319, 95 S.Ct. 1802, 1808, 44 L.Ed.2d 186 (1975) ("[O]nly the 'least possible power adequate to the end proposed' should be used in contempt cases.") (quoting *Anderson v. Dunn*, 19 U.S. (6 Wheat.) 204, 231, 5 L.Ed. 242 (1821)). The government states that the trial court did in fact seek alternatives to summary contempt, by telling Mr. Brooks that he should collect himself and "stopping the proceedings to allow" him to do so. We find the government's reasoning on this point unpersuasive.

---

7. The use of summary contempt proceedings to fine absent persons, including attorneys, has been sharply criticized as inappropriate because the reason underlying the absence will almost always be outside of the immediate knowledge of the court. *Swisher, supra*, 572 A.2d at 97–100 (Schwelb, J., concurring).

Although warning a putative contemnor not to commit the acts later complained of may sometimes be an effective way for a trial judge to try to prevent, or diminish, the occurrence of the act itself, it does not meet this court's repeated requirement that, when faced with contumacious behavior that has already occurred, trial judges contemplating holding the actor in contempt must "explore alternatives to summarily holding [an individual] in contempt." *McCormick, supra,* 635 A.2d at 349; *see also Swisher, supra,* 572 A.2d at 94. What we intended by that directive is that trial courts faced with the necessity to institute contempt proceedings, after the commission of the offensive act, resort to the summary contempt procedures of Rule 42(a) *only* when the procedures of Rule 42(b) are insufficiently swift and forceful to alleviate an urgent need for the restoration of court order so that the court's business may continue. *McCormick, supra,* 635 A.2d at 349–50. In this case, proceedings under Rule 42(b) would have preserved the court's effective operations while protecting Mr. Brooks's essential rights under the Due Process Clause. Because Mr. Brooks was no longer participating in or disrupting proceedings when·he made what was to be his final statement, he was entitled to show cause, under Rule 42(b), why he should not be held in contempt with the full panoply of rights accorded ordinary putative contemnors. *Id.* at 348, 350–51. Because procedures pursuant to Rule 42(b), including immediate in-court issuance of an order to show cause at a later hearing, would have more than adequately vindicated the court's authority in this case, the judge erred in proceeding to summary contempt under Rule 42(a).

## IV. SUFFICIENCY OF THE EVIDENCE

The error in proceeding under summary contempt would normally require a remand. We decline to remand this case, however because we hold that the evidence was insufficient that Mr. Brooks acted contumaciously. In order to convict, the trial court must conclude, beyond a reasonable doubt, that the alleged contemnor committed a contumacious act with a wrongful state of mind. *Gorfkle, supra,* 444 A.2d at 939. There re-

mains at this juncture a question whether Mr. Brooks violated an order of the court—explicit or implicit—or committed another contumacious act. Additionally, there is a substantial doubt whether Mr. Brooks had the state of mind required for the conviction to stand.

Our finding that the evidence was insufficient has two bases. First, the certification provided by the trial court is insufficient as a matter of law to conclude that Mr. Brooks committed the acts in question with the requisite *mens rea.* Second, based on our review of the evidence in this case we conclude that some of the facts contained in the certification that were relied upon by the trial court are not supported by the record. *L.G., supra,* 639 A.2d at 605–07.

To be convicted of criminal contempt under D.C.Code § 11–944 (1995), a defendant must engage in either willful disobedience of a court order causing an obstruction of justice, *(W. Edward) Thompson, supra,* 454 A.2d at 1326 (citations omitted), or contemptuous conduct committed in the presence of the court, *Warrick v. U.S.,* 528 A.2d 438, 443 (D.C.1987). This court has reversed convictions of contempt where, as here, the contemnors' actions could not adequately be considered willful or with the intent to disrespect the court. *See, e.g., Kraut,. supra,* 580 A.2d at 1314; *Gorfkle, supra,* 444 A.2d at 941; *In re Schwartz,* 391 A.2d 278, 281 (D.C.1978); *In re Brown,* 320 A.2d 92, 94–95 (D.C.1974); *see also Sykes v. United States,* 144 U.S.App. D.C. 53, 55, 444 F.2d 928, 930 (D.C.Cir.1971). Assuming for the moment that the facts found in the court's Rule 42(a) certification are supportable by the evidence, they are not sufficient to constitute contempt of court. *Cf. Offutt, supra,* 348 U.S. at 14, 75 S.Ct. at 13 (noting that the summary contempt power "entrusted to a judge [should be] wholly unrelated to his personal sensibilities, be they tender or rugged").

First, Mr. Brooks did not violate an order of the court. In its certification reciting the instances of Mr. Brooks's alleged misconduct, the trial court first states that Mr. Brooks undertook to "lean over [the landlord's attor-

ney] and move his hands in a threatening manner." While the exact interpretation of that assertion by the court is discussed more fully in the following paragraphs, it cannot be controverted that at the time that he allegedly engaged in this gesticulation, Mr. Brooks had been warned of nothing. *See L.G., supra,* 639 A.2d at 606 n. 6 (refusing to endorse trial court's conclusion that first unwarned act of misconduct in a succession of similar warned acts can constitute violation of a court order); *(Raymond B.) Thompson, supra,* 419 A.2d at 996 ("One cannot be contemptuous of a court order if he has no knowledge of it."). Focussing, then, on the period following the court's first warning "to calm down," the trial court's essential claim is that Mr. Brooks failed to conduct himself with sufficient calm. The court's directive to be calm, however, is vague, and a failure to conform therewith raises serious questions of fairness. *Cf. Papachristou v. Jacksonville,* 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31 L.Ed.2d 110 (1972) (striking the application of a statute on grounds of unconstitutional vagueness). Unlike a court's admonition to appear for court, *Swisher, supra,* 572 A.2d at 86–87, return to court, *Brown, supra,* 320 A.2d at 93, stop talking, *Irby, supra,* 342 A.2d at 40, avoid certain subject matter on direct examination or in argument, *(W. Edward) Thompson, supra,* 454 A.2d at 1325–26, file a particular pleading, *Kraut, supra,* 580 A.2d at 1307–08, stop banging a fist on counsel table, *Ellis, supra,* 264 A.2d at 302, or respond to a question asked, *Gates, supra,* 248 A.2d at 672–74, the trial judge's directive to Mr. Brooks that he should calm down and that he should be courteous, presumably during the pendency of his court proceeding, insufficiently put him on notice that his expression of anger, which took place as he was exiting the well of the court, could result in a period of incarceration. The trial court's admonition to Mr. Brooks lacked the clarity and certainty that are required of a court order before this court can agree that Mr. Brooks willfully violated it. *Bethard, supra,* 650 A.2d at 653–54.

Second, assuming that even if there was no violation of an express court order, Mr. Brooks' conduct nonetheless was disrespectful of the court or disrupted its proceedings, the court's certification is legally insufficient because it fails to make any finding of fact regarding the required element of willfulness. *Bethard, supra,* 650 A.2d at 653–54 ("We note that the court, in its Order of Contempt, *see* Appendix, does not attribute willfulness to any of appellant's disruptive behavior in the courtroom while he awaited the calling of his case."). The trial court never found that Mr. Brooks *intended* to disrespect the court, violate an order, or disrupt the proceedings in which he was participating. *Gorfkle, supra,* 444 A.2d at 940; *Schwartz, supra,* 391 A.2d at 282. Under the circumstances of this case, the requisite intent cannot be fairly inferred. *Bethard, supra,* 650 A.2d at 654; *In re Foshee,* 358 A.2d 332, 334 (D.C.1976).

According to the trial court, Mr. Brooks allegedly spoke in a "loud manner" when responding to the court, and used "profanity and inflammatory language" as he was leaving the courtroom. Neither of these alleged infractions is sufficient to suggest the necessary *mens rea.* There is no indication that Mr. Brooks intended to speak or thought he was speaking in a loud manner or knew that speaking in a loud manner alone would violate the court's order to be courteous or otherwise show disrespect for the court. Although Mr. Brooks was clearly agitated during the proceedings, when given the opportunity to speak, Mr. Brooks apologized— "profusely," according to the trial court—for his inability to contain himself fully. Mr. Brooks used no words in the course of his presentation that could be construed "in light of the surrounding circumstances" as disrespectful. *Bethard, supra,* 650 A.2d at 653 (quoting *Ellis, supra,* 264 A.2d at 301). The inflammatory language complained of was used exclusively when his case was recessed. There is no evidence in the court's certification that supports the conclusion that Mr. Brooks knew or had reason to know that comments made after the conclusion of his proceedings could violate the court's admonition that the parties ought to be calm and courteous to each other while in a court of law.

The trial court also failed to indicate that Mr. Brooks intended to direct any of his

contumacious comments to the court or, with the exception of the hand gestures, even to the opposing party. "[T]he record as it appears before us is devoid of evidence that [the appellant's] comment showed such 'flagrant disrespect for the court' as to merit a conviction for criminal contempt." *Warrick I, supra,* 528 A.2d at 444 (quoting *Schwartz, supra,* 391 A.2d at 282) (reversing conviction where the appellant stated to the judge after sentencing that "[t]he day will come for your judgment"). Mr. Brooks's comment, referring to the landlord and his representatives in the third person, indicates that Mr. Brooks's anger was being expressed either to Ms. Thomas, his wife, or to Ms. Hay, the supervisor at the Law Students in Court program whose representations had apparently upset him. Mr. Brooks thus limited his outbursts to times when he might have thought his conduct fell outside the court's jurisdiction. Mr. Brooks had no reason to want his proceedings disrupted, in that it was he who had initiated them by seeking the enlargement of time. There is no indication that he intended to disrupt other proceedings being heard in L & T court that day. From the facts described in the court's certification, we cannot say with fair assurance that any evidence exists upon which a reasonable mind could conclude beyond a reasonable doubt that Mr. Brooks had the requisite "wrongful state of mind." *Gorfkle, supra,* 444 A.2d at 939.

In addition to determining that the trial court's certification was legally insufficient to support a conviction of contempt, we are concerned that certain facts in the certification are not supported by the evidence in the record.[8]

■ In particular, the trial court's finding that Mr. Brooks engaged in threatening hand motions, first articulated in the written certification produced some four days after the incident, did not state how Mr. Brooks's hand gestures threatened the landlord's attorney,

or what the gestures appeared to convey, thereby rendering the conduct ambiguous from its description. *McCormick, supra,* 635 A.2d at 351; *see also Daniels, supra,* 570 A.2d at 423 ("The need for reliability was heightened in this case, because the [contemnor's] objectionable conduct was nonverbal, and the record does not so easily lend itself to validating the judge's factual findings."). There is no evidence in the record that the landlord's attorney felt threatened, or even noticed, the hand gesture in question.

This court has held with reference to an ambiguous *statement* that it is the obligation of the trial court, through its Rule 42(a) certification, to "demonstrate, by describing [the appellant's] tone of voice or accompanying conduct, for example, that the comment was indeed threatening or sinister." *Warrick I, supra,* 528 A.2d at 444; *McCormick, supra,* 635 A.2d at 351. The trial court failed to meet this requirement with respect to the hand gesture. From the available transcript, we are unable to discern support for the court's conclusory description of Mr. Brooks's gesticulation. We thus conclude as a legal matter that the court's finding of a threatening hand gesture "lacks evidentiary support." *L.G., supra,* 639 A.2d at 606.

■ It is well-established that where this court is unable to find adequate support for some of the facts relied upon in a trial judge's Rule 42(a) certification, the conviction cannot stand regardless of whether the facts that *are* supported in the record could independently satisfy the elements of contempt. *Id.* at 606–07; *Kraut, supra,* 580 A.2d at 1313–14 (quoting *Eaton v. City of Tulsa,* 415 U.S. 697, 698, 94 S.Ct. 1228, 1230, 39 L.Ed.2d 693 (1974) (per curiam) (the court's question on review "is not upon what evidence the trial judge *could* find petitioner guilty but upon what evidence the trial judge *did* find petitioner guilty")). This court has never addressed, and does not now, whether the use of profanity alone, assuming the neces-

---

8. Similar problems arise from the court's repeated claim that it had to call Mr. Brooks's case three times. Mr. Brooks, who had a live case in L & T court, was entitled to have his case called at least once on March 18, 1994. The necessity for the first recall of the case was brought about by the court's instruction to Mr. Brooks to calm

down and compose himself which, from the record, it appears he had already done. The second recall of the case was the court's summary contempt action against Mr. Brooks, not part of the L & T proceeding. This last recall therefore does not qualify as evidence of Mr. Brooks's disruption of the court's L & T proceedings.

sary intent and obstruction of justice, can meet the elements of contempt.[9] *L.G., supra*, 639 A.2d at 606 n. 5 (citations omitted). Mr. Brooks does not and could not contest that he used profanity on March 18. Nevertheless, because the trial court based its certification on several other facts, in order for the contempt conviction to stand, all the facts must be supported by the evidence. In this case, they were not.

Considering the absence of a clear order proscribing Mr. Brooks's behavior, and the lack of evidence to support either that Mr. Brooks intended to disrespect the court or the opposing party, we cannot say that in this case the trial court has provided adequate support for the conclusion that Mr. Brooks acted contumaciously. Thus, we reverse Mr. Brooks's conviction without remand. *Kraut, supra*, 580 A.2d at 1313–14.

### V. CONCLUSION

"Summary contempt, especially summary criminal contempt, is not a power lightly to be exercised." *United States v. Wilson*, 421 U.S. 309, 321, 95 S.Ct. 1802, 1809, 44 L.Ed.2d 186 (1975) (Blackmun, J., concurring). This case does not represent the first time this court has had to reverse a summary contempt conviction after a sentence had already been served. *See, e.g., Bethard, supra*, 650 A.2d at 655. We expect that this opinion, read in conjunction with other recent cases such as *McCormick, supra*, provides clearer guidelines to assist judges in the decision whether to conduct contempt proceedings summarily, under Rule 42(a), or pursuant to the more traditional safeguards used in nonsummary proceedings, pursuant to Rule 42(b). The risk that contemnors may be forced to serve their full sentences prior to obtaining full appellate review of their summary contempt convictions creates a great obligation on trial judges not to act precipitously in vindicating their authority. *See*

9. There is, as we have discussed, no basis to conclude that Mr. Brooks either had the requisite state of mind or impeded the administration of justice in court.

1. Ms. Thomas and Mr. Brooks entered into a praecipe with their landlord Home Realty, Inc.,

*Cooke, supra*, 267 U.S. at 539, 45 S.Ct. at 396.

Mr. Brooks's conviction is hereby

*Reversed.*

### APPENDIX

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

### CRIMINAL DIVISION

### SPECIAL PROCEEDINGS BRANCH

United States of America

v.

Clyde Brooks, Sr.

SP 625–94
### *ORDER OF CONTEMPT*

Pursuant to Superior Court Criminal Rule 42(a), "criminal contempt may be punished summarily if the judge certifies that she saw or heard the conduct constituting the contempt and that it was committed in the actual presence of the court." This Order of Contempt so certifies and further complies with Criminal Rule 42(a).

On March 18, 1994, defendant Brooks appeared before the court in the matter of *Home Realty, Inc. v. Carol Thomas and Clyde Brooks, Sr.*, L & T No. 7057–94. During proceedings in Case Number 7057–94, the court held the defendant in summary contempt of court for the following reasons:

1. Mr. Brooks was before the court requesting a two (2) week extension of time to make payment of a $200.00 Protective Order imposed by the Court on March 14, 1994.[1] Mr. Brooks along with Ms. Thomas represented that they had been told by D.C. Law Students in Court that the plaintiff would agree to a two week continuance if the Court agreed to permit such a continuance.

whereby Ms. Thomas and Mr. Brooks agreed to make regular monthly rent payments commencing in April. The court entered a protective order requiring Ms. Thomas and Mr. Brooks to make a $200.00 payment by March 18, 1994.

2. The plaintiff, Home Realty, represented by Mr. David Lietz, voiced opposition to the defendants' Motion for Extension of Time. During plaintiff's representations, the Court observed Mr. Brooks stand extremely close to Mr. Lietz, lean over him and move his hands in a threatening manner. Mr. Brooks [sic] entire demeanor was intimidating.

3. After observing the change in Mr. Brooks [sic] demeanor, the Court was forced to interrupt the representations of plaintiff's counsel in order to instruct Mr. Brooks to calm down. The Court instructed Mr. Brooks that he was in a court of law and that parties have to be courteous to one another.

4. The Court asked for representations by the supervisor of the D.C. Law Students in Court Program, Ms. Anne–Marie Hay.[2] Ms. Hay indicated that she had spoken to Mr. Brooks and Ms. Thomas and that she had advised them to seek an extension of time to satisfy the Court's protective order. Ms. Hay stated that she did not at any time tell Mr. Brooks and Ms. Thomas that plaintiff's counsel had agreed not to oppose a request for extension of time.

5. Upon hearing the representations made by Ms. Hay, Mr. Brooks became irate and started speaking in a loud manner. The court again reminded Mr. Brooks that he was in a Court of law and warned him that he must conduct himself accordingly. The Court told Mr. Brooks and the other parties that she would rule on the defendants' motion but that she was going to briefly pass the matter in order to give Mr. Brooks an opportunity to calm down and compose himself.

6. As the parties were leaving the well of the Court, Mr. Brooks, speaking in an extremely loud tone and using profanity and inflammatory language, expressed his dissatisfaction with the representations made by Ms. Hay. The Court immediately halted the proceeding in progress and ordered Mr. Brooks and all parties involved in this case to return to the courtroom.

7. The case of *Home Realty, Inc. v. Carol Thomas and Clyde Brooks, Sr.*, was promptly recalled and the Court reprimanded Mr. Brooks for his behavior. The Court told Mr. Brooks that his actions were contemptuous and that his conduct had interrupted the administration of justice. The Court, again, instructed Mr. Brooks to calm down.

8. Mr. Brooks profusely apologized to the Court for his behavior and indicated that he had calmed down and was ready to proceed. Plaintiff's counsel again expressed his opposition to an extension of time for defendants to satisfy the Court's protective order.

9. The Court granted Mr. Brooks and Ms. Thomas' Motion for an Extension of Time and ordered the parties to return to court on March 29, 1994. The Court warned Mr. Brooks that if he returned to court on March 29, 1994, with the same attitude and demeanor that the had displayed in the instant proceedings, the Court would hold him in contempt and sentence him to a period of incarceration. The Court then asked Mr. Brooks if he understood her warning. Mr. Brooks indicated that he did understand. The parties were excused and the courtroom clerk called the next matter on the judge's calendar.

10. Again, as the parties were leaving the well of the court, Mr. Brooks speaking in a loud tone and using profanity and inflammatory language, expressed his dissatisfaction with the proceeding and with the conditions of the apartment in question. Mr. Brooks yelled out "they need to fix some of that shit in the apartment."

11. The Court immediately halted its proceedings and called to Mr. Brooks. The Court told Mr. Brooks that he apparently did not understand her warning, to which Mr. Brooks replied, "Oh I understand your honor, you have no say so in this matter, that's what I understand[."] Mr. Brooks then continued to walk out of the courtroom, at which point the Court instructed the courtroom

---

**2.** Ms. Thomas and Mr. Brooks appeared *pro se.* Law Students in Court was asked to make representations only after Mr. Brooks indicated that plaintiff's counsel had given his consent to defendants' Motion for Extension of Time.

clerk to call the U.S. Marshal Service. The U.S. Marshal Services responded to the courtroom and the matter of *Home Realty v. Thomas and Brooks* was recalled.

12. After making findings of fact as to the aforementioned incidents, the Court held Mr. Brooks in Contempt of Court. The Court found defendant's conduct and demeanor to be an affront to the Court and to the administration of justice. The Court found that defendant's conduct was such an affront to the Court that the Court had to interrupt its other proceedings on two occasions. Finally, the Court found that defendant's conduct stopped the administration of justice with respect to his own case on at least three occasions.

The Court's authority to hold a person in contempt is conferred upon it by 18 U.S.C. Section 402 and D.C.Code Section 11–944.

The aforementioned incidents unquestionably rose to the level of criminal contempt. The sentence imposed by the court was 10 days and entered of record and delivered to contemnor on March 18, 1994.

In sum, given the nature of the defendant's conduct, his demeanor in the courtroom throughout the day and his repeated disregard of the Court's warnings, it is clear that defendant's conduct was contemptuous and an affront to the Court and to the administration of justice,

THEREFORE, it is this 22nd day of March, 1994,

ORDERED, that the defendant be held in summary contempt of court and sentenced to a term of 10 days.

SO ORDERED.

/s/ Kaye K. Christian
 Kaye K. Christian
 Associate Judge
 (Signed in Chambers)

RUIZ, Associate Judge, concurring:

Although I agree that the majority correctly limits its opinion to the holding that the certificate and underlying evidence were insufficient to support a contempt conviction, I write separately to address further important procedural safeguards, that, had they been observed in this case, probably would have avoided the unfortunate consequence of Mr. Brooks's having served his ten-day sentence on a fatally defective conviction without benefit of meaningful appellate review. As the majority and Judge Pryor's dissent point out, we strictly scrutinize summary contempt adjudications. Unless the trial court's hand is stayed, however, even close appellate scrutiny can come too late, as in this case. Two requests for stay, one at the trial court level and one before this court, were both denied and thus not sufficient to ensure timely review of a summary contempt conviction that we hold today to have been improperly adjudicated summarily, insufficient as a matter of law and unsupported by the evidence. It is in the context of this reality and with the hope of averting similar cases in the future, that I write to explain why the summary contempt proceedings in this case were constitutionally inadequate because they failed to provide fundamental safeguards generally known to be required by due process.

The Supreme Court "ha[s] stated time and again" that even summary proceedings against an alleged contemnor must meet certain minimum due process standards. *Groppi v. Leslie*, 404 U.S. 496, 502, 92 S.Ct. 582, 586, 30 L.Ed.2d 632 (1972) (citing *In re Oliver*, 333 U.S. 257, 273, 68 S.Ct. 499, 507, 92 L.Ed. 682 (1948)) *quoted in Taylor v. Hayes*, 418 U.S. 488, 498, 94 S.Ct. 2697, 2703, 41 L.Ed.2d 897 (1974). This court has always maintained that the Constitution requires notice and a hearing even where summary contempt is an appropriate measure. *McCormick v. United States*, 635 A.2d 347, 349 (D.C.1993) ("Although due process rights are significantly compromised by summary contempt proceedings, some traditional rights are never surrendered; for example, in a summary contempt proceeding, 'reasonable notice of a charge and an opportunity to be heard in defense before punishment is imposed are "basic in our system of jurisprudence" ', especially when one's liberty is at stake.") (citations omitted).[1] In this constitu-

---

1. It has never been doubted by this court, or any other so far as we know, that notice and hearing are preliminary steps essential to the passing of an enforceable judgment, and that they,

tional light, it is apparent that the procedures used to obtain Mr. Brooks's conviction were deficient.

Mr. Brooks "first learned that he was charged with criminal contempt of court when the trial judge found him guilty of that offense." *Swisher v. United States*, 572 A.2d 85, 86 (D.C.1990); *Williams v. United States*, 551 A.2d 1353, 1354 (D.C.1989) (per curiam) (reversing contempt conviction where judge first mentioned "criminal contempt" at the end of the proceedings finding him guilty). At the time that the trial judge apparently decided to hold Mr. Brooks in contempt, the judge called Mr. Brooks into the room, recalled his case, and commenced to recite findings of fact. The trial judge did not notify Mr. Brooks that he was being charged with contempt, or give him time to formulate a response. Nor was Mr. Brooks given an opportunity either to deny the conduct or offer an explanation to mitigate his culpability. Mr. Brooks, who did not have an attorney, was not alerted at any stage of the contempt proceedings to his right to have an attorney nor offered the services of an attorney to advise him. After holding Mr. Brooks in contempt, the trial judge failed to advise him of his right to appeal. I am convinced that this truncated procedure not only violated the Constitution, but also contributed significantly to the trial court's hasty determination that we find today to be erroneous.

### 1. The Right to Notice and Allocution

Notice of a charge, always deemed a constitutional right, is " 'essential in view of the heightened potential for abuse posed by the contempt power.' " *McCormick, supra*, 635 A.2d at 349 (quoting *Taylor v. Hayes, supra*, 418 U.S. at 500, 94 S.Ct. at 2704). Notice enables one charged with an offense to equip

himself with any available argument or information that will mitigate his culpability, either by persuading the court to recharacterize its recollection of the charged acts, or to change its understanding of the defendant's state of mind in committing them. *See Swisher, supra*, 572 A.2d at 93.[2] The right to allocute is similarly viewed as "a fundamental one[,] which implicates the due process clause." *Warrick v. United States*, 551 A.2d 1332, 1334 (D.C.1988) (*Warrick II*). The importance of bringing forth relevant information about a defendant's character or background prior to his receiving a sentence, particularly where that sentence is jail, is substantial. "In cases like this, where the intention with which acts of contempt have been committed must necessarily and properly have an important bearing on the degree of guilt and the penalty which should be imposed, the court can not exclude evidence in mitigation." *Cooke v. United States*, 267 U.S. 517, 538, 45 S.Ct. 390, 395, 69 L.Ed. 767 (1925).

The judge found Mr. Brooks guilty of contempt and instantly sentenced him to ten days in jail—never inquiring about his background, his criminal record, his family or work obligations, or any of the myriad other factors relevant to the decision whether to impose jail time. *See Swisher, supra*, 572 A.2d at 93 ("Although Swisher was only nineteen years old at the time, had no prior criminal record, and was gainfully employed, the judge gave no apparent consideration to ordering work release or a 'weekend' type of sentence which might protect Swisher's job."). Indeed, as the court learned through subsequent motions submitted in Mr. Brooks's case, one of which the judge treated and granted as Mr. Brooks's motion to modify sentence, mitigating personal and family

together with a legally competent tribunal having jurisdiction of the case, constitute basic elements of the constitutional requirement of due process of law. The words of Webster, so often quoted, that by "the law of the land" is intended "a law which hears before it condemns," have been repeated in varying forms of expression in a multitude of decisions. In *Holden v. Hardy*, 169 U.S. 366, 389, 18 S.Ct. 383, 387, 42 L.Ed. 780, the necessity of due notice and an opportunity of being heard is described as among the "immutable principles of justice which inhere in the very idea of free

government which no member of the Union may disregard."
*Powell v. Alabama*, 287 U.S. 45, 68, 53 S.Ct. 55, 64, 77 L.Ed. 158 (1932).

2. This court has observed that in the context of criminal contempt generally, "the very seriousness of the charge requires that the defendant understand the possible consequences of the proceeding so that he may defend himself appropriately." *Williams, supra*, 551 A.2d at 1354.

circumstances existed that should have been fully aired prior to the imposition of a ten-day sentence in a summary proceeding.

The court never informed Mr. Brooks that he could appeal his conviction to this court, and that he was entitled to an attorney in doing so. *But see* D.C.Code § 11–721 (1995) (granting appeal as of right from all final orders and judgments of the Superior Court); D.C.Code §§ 11–2601 –03 (1995) (providing for the appointment of counsel); *Evitts v. Lucey,* 469 U.S. 387, 393–94, 105 S.Ct. 830, 834–35, 83 L.Ed.2d 821 (1985), *cited in Watson v. United States,* 536 A.2d 1056, 1957 n. 4, 1059–61 (D.C.1987) (en banc), *cert. denied,* 486 U.S. 1010, 108 S.Ct. 1740, 100 L.Ed.2d 203 (1988); *see also* Super. Ct.Crim. R. 32(c)(3). This failure appears from the record to have led to at least a four-day delay in securing the assistance of counsel to move the trial court to reconsider its ruling and then to prosecute this appeal.[3] It cannot be doubted that even if summary contempt proceedings are necessitated by circumstances, the Constitution requires more process than was given to Mr. Brooks. *McCormick, supra,* 635 A.2d at 349–50.

### 2. The Right to Counsel

Criminal contempt, of which Mr. Brooks was convicted, "is a crime in the ordinary sense; it is a violation of the law, a public wrong which is punishable by fine or imprisonment or both." *Bloom v. Illinois,* 391 U.S. 194, 201, 88 S.Ct. 1477, 1481, 20 L.Ed.2d 522 (1968) (citing *Gompers v. United States,* 233 U.S. 604, 610, 34 S.Ct. 693, 695, 58 L.Ed. 1115 (1914)). Whether obtained by summary or nonsummary procedures, a conviction for criminal contempt is "indistinguishable from ordinary criminal convictions, for [its] impact on the individual defendant is the same." *Bloom, supra,* 391 U.S. at 201, 88 S.Ct. at 1482. Contempt is "a crime in every fundamental respect," *id.,* and is accorded a wide variety of procedural safeguards, including the right to a jury where the punishment is a period of incarceration exceeding six months. *Codispoti v. Pennsylvania,* 418 U.S. 506, 94 S.Ct. 2687, 41 L.Ed.2d 912 (1974); *Bloom, supra,* 391 U.S. at 201, 88 S.Ct. at 1481–82. Were we not reversing Mr. Brooks's conviction on insufficiency grounds, it would compromise his employability, his ability to testify credibly as a witness in any future proceeding,[4] and could be considered by a trial court in enhancing a future sentence if Mr. Brooks were ever again to encounter the criminal justice system. *See Green v. Green,* 642 A.2d 1275, 1278 n. 4 (D.C.1994). Despite the seriousness of these consequences, this court has in the past upheld summary contempt convictions obtained in the absence of counsel. *See, e.g., In re Gates,* 248 A.2d 671, 677 (D.C.1968). It generally was held that "[w]hen contempt is committed in the presence of the court[,] there is no right to the assistance of counsel before punishment is imposed." *In re Ellis,* 264 A.2d 300, 305 (D.C.1970) (citations omitted).[5]

---

3. Counsel for Mr. Brooks moved the trial court, pursuant to District of Columbia Court of Appeals Rule 8(a) and *Horton v. United States,* 591 A.2d 1280, 1284 (D.C.1991), for a stay of the sentence pending appeal. The government, at oral argument before this court, cited a stay as the appropriate relief available to the jailed contemnor against whom the judge erred in proceeding summarily. However, in this case, the trial court declined to grant a stay, even though Mr. Brooks had already served seven days of his ten-day sentence and there was no longer any threat to the court's calendar. More significantly, the government, which now directs our attention to the availability of a stay pending appeal, opposed in writing the grant of a stay in Mr. Brooks's case.

Mr. Brooks's request to this court for a stay was also opposed and denied, and was therefore similarly unavailing. Thus, I am unpersuaded, based on the facts of this case, that the opportunity to request a stay is an adequate safeguard against an improper summary contempt adjudication.

4. D.C.Code § 14–305 (1995).

5. The language in *Gates* and *Ellis* is dicta with respect to the precise issue presented by Mr. Brooks' case, whether counsel is required in a proceeding that results in incarceration, as that issue was neither the subject of judicial analysis nor required by the circumstances presented to the court in those cases. *Umana v. Swidler & Berlin Chartered,* 669 A.2d 717, 720 & n. 9 (D.C. 1995). In *Ellis, supra,* a summary contempt case, the court merely recited language from *Gates* in response to the appellant's argument that he was denied the assistance of counsel *of his own choosing* in the contempt proceeding. Mr. Ellis was not unrepresented; the court had appointed counsel for the contemnor, and, as the

Subsequent jurisprudence on the issue, however, requires that these early statements be reconsidered. In 1972, the Supreme Court announced a new rule, that "no person may be deprived of his liberty who has been denied the assistance of counsel.... The denial of the assistance of counsel will preclude the imposition of a jail sentence." *Argersinger v. Hamlin*, 407 U.S. 25, 37–38, 92 S.Ct. 2006, 2013, 32 L.Ed.2d 530 (quoting *Stevenson v. Holzman*, 254 Or. 94, 458 P.2d 414, 418 (1969)) (addressing the Sixth Amendment claim of petitioner who had been unrepresented at trial and jailed for 90 days for committing a misdemeanor). Although recognizing the additional burden that it was placing on the states in the administration of justice, *id.* at 42, 92 S.Ct. at 2014 (Burger, C.J., concurring), the Court held that absent a valid waiver, "counsel must be provided before any indigent may be sentenced to prison, even where the crime is petty and the prison term brief." *Lassiter v. Department of Social Services*, 452 U.S. 18, 25, 101 S.Ct. 2153, 2158, 68 L.Ed.2d 640 (1981).[6]

Later, in *Scott v. Illinois*, 440 U.S. 367, 99 S.Ct. 1158, 59 L.Ed.2d 383 (1979), the Court clarified its ruling, and limited the application of *Argersinger* to those situations where a defendant is actually incarcerated and not merely exposed to jail time. Petitioner Scott

sought the benefit of the *Argersinger* prohibition on jail time for unrepresented defendants because he was statutorily threatened with incarceration as an authorized penalty, even though he received only a $50 fine. *Id.* at 368, 99 S.Ct. at 1159. Recognizing the difficulty of "constitutional line drawing," *id.* at 372, 99 S.Ct. at 1161, the Court stated that "the central premise of *Argersinger*—that actual imprisonment is a penalty different in kind from fines or the mere threat of imprisonment—is eminently sound and warrants adoption of actual imprisonment as the line defining the constitutional right to appointment of counsel." *Id.* at 373, 99 S.Ct. at 1162. By its ruling, the Court permitted the states to tailor the demands of *Argersinger* to the exigencies of their particular criminal justice systems—and where appropriate, to avoid the constitutional requirement that defense counsel be appointed by committing the government not to seek or the courts not to impose incarceration as punishment in a particular case. *See id.* at 373–74, 99 S.Ct. at 1162.

The right to appointed counsel depends exclusively on the deprivation of liberty and thus applies even where the proceeding in question is purely a civil one. *See Lassiter, supra,* 452 U.S. at 25, 101 S.Ct. at 2158–59. This protection extends to contempt proceed-

court noted, "both appointed counsel and appellant were afforded an opportunity to speak." 264 A.2d at 305. Although the attorney held in contempt in *Gates* was not himself represented by an attorney during the contempt hearing, it is unclear from the opinion in *Gates* whether the appellant was incarcerated as a result of two contempt convictions for which the court imposed on the attorney two fifty dollar fines, which, if not paid, would result in ten days in jail with respect to each. During the course of the judge's interaction with appellant, the judge repeatedly emphasizes the fine, not incarceration. On appeal, this court did not address whether incarceration—if such was the result—made any difference to the right to counsel. *Gates* relied on *Cooke, supra,* in which the Supreme Court held that because the contemptuous conduct did not occur in the presence of the court, due process required notice of the charges, a reasonable opportunity to present a defense, assistance of counsel and the right to call witnesses or give testimony to defend against the charges or in mitigation of punishment. 267 U.S. at 536–37, 45 S.Ct. at 395. The continuing validity of the discussion in *Cooke* with respect to the absence

of similar due process requirements in summary contempt proceedings is discussed *infra* in the context of the Supreme Court's subsequent decision in *Powell v. Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932), *Argersinger v. Hamlin*, 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972), and later cases.

6. The right to counsel is distinct from the constitutional right to a jury, which the Supreme Court has held is limited to serious offenses, i.e., those resulting in incarceration of six months or more. *Duncan v. Louisiana*, 391 U.S. 145, 159, 88 S.Ct. 1444, 1453, 20 L.Ed.2d 491 (1968). The Court has explicitly rejected "the premise that since prosecution for crimes punishable by imprisonment for less than six months may be tried without a jury, they may also be tried without a lawyer." *Argersinger, supra,* 407 U.S. at 30–31, 92 S.Ct. at 2009. The Court is "by no means convinced that legal and constitutional questions involved in a case that actually leads to imprisonment even for a brief period are any less complex than when a person can be sent off for six months or more." *Id.* at 33, 92 S.Ct. at 2010.

ings, which are considered civil if meant to coerce a prospective act, and criminal if meant to punish a past one.[7] *See Ridgway v. Baker*, 720 F.2d 1409, 1413 (5th Cir.1983) (multiple state citations omitted) (noting that incarceration to enforce civil contempt creates a right to counsel at a hearing); *see also, e.g., Dube v. Lopes*, 40 Conn.Supp. 111, 481 A.2d 1293, 1295 (1984); *People v. Lucero*, 196 Colo. 276, 584 P.2d 1208, 1214 (1978); *Rudd v. Rudd*, 45 A.D.2d 22, 356 N.Y.S.2d 136, 138 (N.Y.App.Div.1974); *Commonwealth v. Tirado*, 487 Pa. 362, 409 A.2d 392, 396 (1979). A number of federal circuits have had occasion to apply the *Argersinger* rule in the area of civil contempt, where the right to counsel had previously been in question. *See, e.g., United States v. Bobart Travel Agency, Inc.*, 699 F.2d 618 (2d Cir.1983) (recognizing the right under *Argersinger* to counsel for contemnor attempting to assert a questionable Fifth Amendment privilege); *United States v. Anderson*, 553 F.2d 1154, 1155 (8th Cir.1977) (reversing conviction of unrepresented contemnor who refused to produce records summoned by the Internal Revenue Service); *In re Di Bella*, 518 F.2d 955, 959 (2d Cir.1975) (announcing the "right to the effective assistance of counsel in a civil contempt proceeding") (citation omitted); *In*

*re Kilgo*, 484 F.2d 1215, 1221 (4th Cir.1973) (indicating that "[t]here can be no doubt that Kilgo was entitled to counsel at the civil contempt hearing") (citing *United States v. Sun Kung Kang*, 468 F.2d 1368, 1369 (9th Cir.1972)).[8]

Courts that address the constitutional source of the right to counsel in proceedings which result in incarceration have recognized either a Sixth Amendment basis, or a Fifth (or Fourteenth) Amendment due process entitlement incorporating that Sixth Amendment protection.[9] The right to the presence of counsel, as a due-process matter, derives from and also lends substance to the recognized right to a hearing prior to the imposition of punishment. "The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel." *Powell, supra*, 287 U.S. at 68–69, 53 S.Ct. at 64. Representation by an attorney is considered to be a right implied in the guarantee of having an opportunity to defend oneself at a hearing, and is often regarded as a right both basic and essential. *In re Oliver*, 333 U.S. 257, 273, 68 S.Ct. 499, 507, 92 L.Ed. 682 (1948) (citing *Morgan v. United States*, 304 U.S. 1, 14–15, 58 S.Ct. 773, 774–75, 82 L.Ed. 1129 (1938); *Snyder v. Massachusetts*, 291 U.S. 97, 116, 54 S.Ct. 330, 336,

7. Where the civil contemnor can free himself of the punishment by performing a particular act, he is deemed to have purged himself of the contempt. *Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 441–43, 31 S.Ct. 492, 498–99, 55 L.Ed. 797 (1911); *Jennings v. United States*, 354 A.2d 855, 856 (D.C.1976). Contempt is considered criminal where a fixed punishment is imposed for an act already committed. *Gompers v. Bucks Stove, supra*, 221 U.S. at 442–43, 31 S.Ct. at 498.

8. It has been suggested that the application of *Argersinger* to incarceration for civil contempt is uncontroversial. For example, in rejecting injunctive relief to a petitioner evading child-support obligations and seeking counsel to represent him at a contempt hearing, the United States Court of Appeals for the Ninth Circuit noted the decision in *Argersinger* that had been announced since the initiation of the contempt proceedings, and stated that "[t]he state trial judge, now cognizant of *Argersinger*, will most assuredly know that if a lawyer is not appointed for [the petitioner's] representation, [the petitioner] cannot be confined even if found to have been contemptuous." *Henkel v. Bradshaw*, 483 F.2d 1386, 1389 (9th Cir.1973). I submit that the proposition that there is an entitlement to counsel prior to

adjudication resulting in incarceration is even less controversial in the case of criminal contempt—even summary contempt—proceedings than in civil contempt because, in addition to incarceration, criminal contempt results in a conviction and cannot be purged by the contemnor.

9. *See, e.g., Walker v. McLain*, 768 F.2d 1181, 1183 (10th Cir.1985), *cert. denied*, 474 U.S. 1061, 106 S.Ct. 805, 88 L.Ed.2d 781 (1986); *Ridgway v. Baker, supra*, 720 F.2d at 1413; *United States v. Johnson*, 659 F.2d 415, 416–17 (4th Cir.1981); *Anderson, supra*, 553 F.2d at 1156; *Otton v. Zaborac*, 525 P.2d 537, 539 (Alaska 1974); *Emerick v. Emerick*, 28 Conn.App. 794, 613 A.2d 1351, 1353 (1992); *Rutherford v. Rutherford*, 296 Md. 347, 464 A.2d 228, 234, 237 (1983); *Hickland v. Hickland*, 56 A.D.2d 978, 393 N.Y.S.2d 192, 195 (N.Y.App.Div.1977); *Darbonne v. Darbonne*, 85 Misc.2d 267, 379 N.Y.S.2d 350, 351–52 (N.Y.Sup.Ct.1976); *Commonwealth ex rel. Brown v. Hendrick*, 220 Pa.Super. 225, 283 A.2d 722, 723–24 (1971); *Tetro v. Tetro*, 86 Wash.2d 252, 544 P.2d 17, 19–20 (1975); *Ferris v. Maass*, 75 Wis.2d 542, 249 N.W.2d 789, 791 (1977).

78 L.Ed. 674 (1934); *Hovey v. Elliott,* 167 U.S. 409, 418, 17 S.Ct. 841, 845, 42 L.Ed. 215 (1897)) (additional citations omitted). The benefits of legal counsel are legion in the case of an inexperienced litigant such as Mr. Brooks. "That which is simple, orderly and necessary to the lawyer, to the untrained layman may appear intricate, complex and mysterious." *Johnson v. Zerbst,* 304 U.S. 458, 463, 58 S.Ct. 1019, 1022, 82 L.Ed. 1461 (1938).

The application by state and federal courts of a rule requiring counsel in contempt proceedings resulting in incarceration comports with this court's long-standing jurisprudence requiring that putative out-of-court contemnors be represented by counsel prior to being incarcerated. *Thompson v. Thompson,* 559 A.2d 311, 314 (D.C.1989) (citing Matter of *Wiggins,* 359 A.2d 579, 581 & n. 5 (D.C.1976) (citing cases)); *see also Jennings v. United States,* 354 A.2d 855, 857 (D.C.1976) (Mack, J., concurring) ("One charged with civil contempt must be given adequate notice of the charge and an opportunity to be heard with counsel."). Applying the *Argersinger* principle to civil and non-summary criminal contempt reflects a recognition that "any deprivation of liberty is a serious matter." *Argersinger, supra,* 407 U.S. at 41, 92 S.Ct. at 2014 (Burger, C.J., concurring in the result). As the Supreme Court held in *Lassiter, supra,* 452 U.S. at 25, 101 S.Ct. at 2158, "it is the defendant's interest in personal freedom, and not simply the special Sixth and Fourteenth Amendments right to counsel in criminal cases, which triggers the right to appointed counsel" where an individual is incarcerated as a result of a court proceeding.[10]

The question presented, then, is whether summary contempt proceedings are exempt from the evolving jurisprudence, derived from *Argersinger,* that due process requires the assistance of counsel in a proceeding that results in actual incarceration.

Some courts had determined even prior to *Argersinger* that as a due process matter, summary contempt could require that counsel be appointed prior to the imposition of a jail sentence. *See, e.g., Johnson v. United States,* 344 F.2d 401, 411 (5th Cir.1965) (holding that counsel should have been appointed where witness who had waived counsel in his own prosecution refused to testify against a former codefendant); *cf. Levine v. United States,* 362 U.S. 610, 619, 80 S.Ct. 1038, 1044, 4 L.Ed.2d 989 (1960) (upholding contempt conviction obtained at hearing *in camera* in part because counsel was present and contemnor was not deprived of "effective legal assistance"). Few courts have squarely addressed the summary contempt issue since the *Argersinger* decision. Of those courts that have reached the matter, some, such as those in New Jersey, have failed to state a clear mandate on the issue. *See, e.g., State v. Gale,* 226 N.J.Super. 699, 545 A.2d 279, 282 (Law Div.1988) (holding that defendant who admittedly perjured himself before the court was entitled to counsel prior to incurring penalty of imprisonment for summary contempt); *In re Daniels,* 118 N.J. 51, 570 A.2d 416, 423–25, 427, *cert. denied,* 498 U.S. 951, 111 S.Ct. 371, 112 L.Ed.2d 333 (1990) (encouraging careful balancing of due process rights where "imprisonment may be warranted" and noting that certification to another judge with appointment of counsel should occur unless "there is no other way to continue" the proceeding); *see id.* 570 A.2d at 423 (rejecting the application of *Argersinger* to contempt proceeding initially resulting in incarceration "where the party is an experienced trial attorney" and jail sentence had been vacated by appellate court). Other states, in the absence of more direct Supreme Court guidance, have rejected the applicability of *Argersinger* to the summary contempt context. *See, e.g., Saunders v. State,* 319 So.2d 118, 125 (Fla.Dist.Ct.App. 1975); *Skolnick v. State,* 180 Ind.App. 253,

10. This view of the rights enjoyed by putative contemnors comports with the Supreme Court's statement that the "[p]rocedural safeguards for criminal contempt do not derive from the Sixth Amendment," but from generally-accepted principles of due process and the belief that " 'justice must satisfy the appearance of justice.' " *Levine*

*v. United States,* 362 U.S. 610, 616, 80 S.Ct. 1038, 1042, 4 L.Ed.2d 989 (1960) (quoting *Offutt v. United States,* 348 U.S. 11, 14, 75 S.Ct. 11, 13, 99 L.Ed. 11 (1954)) (holding that although contempt hearing *in camera* would have violated right to a public trial, counsel had made no request to open the proceedings).

388 N.E.2d 1156, 1164 (1979), *cert. denied,* 445 U.S. 906, 100 S.Ct. 1085, 63 L.Ed.2d 323 (1980); *State v. Case,* 100 N.M. 173, 667 P.2d 978, 982–83 (Ct.App.1983).

Of particular relevance to us, two nearby jurisdictions have followed the *Argersinger* rule in the summary contempt context. In *Commonwealth v. Crawford,* 466 Pa. 269, 352 A.2d 52 (1976), the Supreme Court of Pennsylvania addressed the question whether a witness who refused to testify at a trial before a judge who warned him that sanctions would summarily be imposed if the refusal persisted could be held in contempt and sentenced to six months of incarceration without having had the benefit of counsel at the proceeding. Relying on its earlier decision in *Commonwealth v. Abrams,* 461 Pa. 327, 336 A.2d 308 (1975), where another direct contemnor had been summarily sentenced to six months in prison, the court held that where an individual is not informed of his right to counsel and does not knowingly and intelligently waive that right, *Argersinger* states that the proceedings culminating in incarceration necessarily violate due process and the conviction "cannot stand." *Crawford, supra,* 352 A.2d at 52.

Similarly, in *Pitts v. State,* 421 A.2d 901 (Del.1980), the Supreme Court of Delaware reversed the contempt conviction of a witness who was summarily sentenced to two consecutive sentences of five months' imprisonment for refusing repeated directives from the trial court to answer questions put to him by the government, where the witness disclaimed knowledge of the subject matter despite having previously testified substantively in the same case. The Delaware court concluded, first, that the trial court did not err in holding a summary contempt hearing, but second, that on the facts of that case, the failure to appoint counsel required reversal of the conviction. *Id.* at 906.

This court has explicitly reserved the question whether to adopt the reasoning of *Crawford* regarding summary contempt. *Thompson v. Thompson, supra,* 559 A.2d at 314 n. 6. In *Thompson v. Thompson,* we confirmed the right to counsel of an out-of-court contemnor in a criminal contempt proceeding arising from a violation of a civil protection order. Because the due process right to counsel is based on a liberty interest that is just as compromised in a summary contempt proceeding as in a proceeding involving nonsummary contempt, the same constitutional safeguard applies where the alleged contempt occurred in court, so long as the adjudication of contempt can and does result in incarceration.

"A defendant's actual incarceration in a jail, as a result of a proceeding at which he was unrepresented by counsel and did not knowingly and intelligently waive the right to counsel, is fundamentally unfair." *Rutherford, supra,* 464 A.2d at 235. In analyzing the applicability of *Argersinger* to Mr. Brooks's case, we should take into account that although imprisonment for summary contempt may often be of a short duration, "imprisonment for however short a time will seldom be viewed by the accused as a trivial or 'petty' matter and may well result in quite serious repercussions affecting his career and his reputation." *Baldwin v. New York,* 399 U.S. 66, 73, 90 S.Ct. 1886, 1890, 26 L.Ed.2d 437 (1970). In view of this reality, and the broad language of *Argersinger,* its application to earlier nonsummary contempt cases in our court as well as in the various federal circuits in the context of civil contempt where the contemnor is incarcerated, *id.* at 314–15 (citations omitted), I perceive no compelling reasons to withhold the protection of counsel from defendants in summary contempt proceedings that actually result in the contemnor's incarceration.[11]

---

**11.** No principle can be articulated whereby a due process rule confirming a right to counsel prior to incarceration would apply to civil contempt—where the contemnor himself can obtain his release at any time by compliance with a court order, and where no conviction results from the proceeding—and would not apply in the criminal context of Mr. Brooks's case, where once the order of contempt is entered, it is final, and the

contemnor's options are essentially limited to the service of his sentence and an eventual appeal. The exclusion of summary contempt from a categorical constitutional rule such as that announced in *Argersinger* strains logic and, where the trial judge decides in the first instance under which rule to proceed, defies both reason and justice. "[T]he burden of imprisonment is just as

Under *Argersinger v. Hamlin,* therefore, no contemnor may be sentenced to incarceration, whether as a result of a summary or nonsummary proceeding, if he was not represented by counsel. This rule does not extend to summary contempt proceedings resulting in punishment other than incarceration, *see, e.g., In re (W. Edward) Thompson,* 454 A.2d 1324, 1328 (D.C.1982); *In re (Raymond B.) Thompson,* 419 A.2d 993, 995 (D.C.1980), and would leave undisturbed existing jurisprudence regarding the adequacy of the procedure where a contemnor is sentenced to jail after a summary hearing occurring within a larger proceeding in which counsel already was present for the purposes of that larger proceeding. *See, e.g., Swisher, supra,* 572 A.2d at 93 (reversing in part on right-to-counsel grounds even where counsel was technically present); *Irby v. United States,* 342 A.2d 33, 41 (D.C.1975) (affirming conviction where counsel was present for underlying case). This clarification of the reach of the *Argersinger* rule to summary contempt proceedings, thus, would reach only that small class of cases in which persons appearing in court without an attorney are sent to jail for criminal contempt because extraordinary circumstances require that the judge proceed summarily.

It is a fact that trial judges at times must operate under real pressure from unruly, disruptive, or uncooperative litigants and lawyers who add to the court's already heavy caseloads. As Judge Pryor's dissent points out, the courts' traditional contempt power, and particularly the ability to conduct summary contempt proceedings, is a necessary and valuable tool to address disruptive or disrespectful behavior that threatens the court's ability to maintain the dignity and flow of judicial proceedings. As the Supreme Court stated in *Cooke, supra,* the reason for the distinction between the procedural safeguards required of nonsummary contempt proceedings and the absence of such procedural safeguards in summary contempt proceedings for contempt in open court is "the danger that, unless such an open threat to the orderly procedure of the court and such a flagrant defiance of the

great, regardless of what we call the order that

person and presence of the judge before the public ... is not instantly suppressed and punished, demoralization of the court's authority will follow." 267 U.S. at 536, 45 S.Ct. at 394–95. Thus, elimination of the contemnor's procedural safeguards has been the price paid to accomplish the important goal of preserving the court's public authority. If, however, due process requires the assistance of counsel in summary contempt proceedings resulting in incarceration, the court must in some way be able to maintain order in situations requiring immediate action, including incarceration, to preserve the authority of the court. Thus, it is important to recognize the need for constitutionally sound procedures that a court might follow in a situation presenting a real disruption to the administration of justice.

The Delaware Supreme Court, in its opinion in *Pitts, supra,* indicated that it was hesitant to announce "a blanket constitutional ruling that *Argersinger* applies in every case of summary contempt regardless of how aggravated the circumstances," although it did "not think the United States Supreme Court would depart from the *Argersinger* requirement on the facts of this case." 421 A.2d at 906. The unresolved area, the court indicated, is whether a "hypothetical disorderly and violent defendant" creating an "emergency such as conduct physically threatening to people and property in the courtroom [or] other exigency unduly interfering with trial proceedings" could not be incarcerated until counsel had been appointed. *Id.* Even assuming that we were faced with such an emergency situation in this case, which we are not, there appears to be no reason to depart from the traditional procedure whereby a trial court, or any law-enforcement officer, who witnesses an offense may preventively detain an individual until a further determination on the merits may be obtained—in the case of a direct contemnor, a short recess pending a Rule 42(b) hearing with counsel or certification to another judge. *See County of Riverside v. McLaughlin,* 500 U.S. 44, 56, 111 S.Ct. 1661, 1669–70, 114 L.Ed.2d 49 (1991) (limiting post-arrest detention pending judicial present-

imposed it." *Di Bella, supra,* 518 F.2d at 959.

ment to 48 hours). Although summary punishment is well-established as appropriate for litigants whose culpability no additional information could mitigate, courts already have at their disposal means to take disruptive contemnors into immediate custody when legal proceedings are actively being obstructed. Longer detention without counsel for alleged direct contemnors than that accorded ordinary criminal defendants is incompatible with the justification underlying summary contempt, which is the immediate, in-court restoration of order.

Failure to observe the constitutional mandate requiring counsel prior to a conviction leading to incarceration results in a reversal of the conviction. *Crawford, supra*, 352 A.2d at 52. This court and others have indicated that once the right to counsel has been established, a contempt conviction will be reversed even where the contemnor had counsel but was unable to consult or be represented meaningfully by that counsel at critical points in the proceedings where the contempt issued. *Swisher, supra*, 572 A.2d at 93; *see also Di Bella, supra*, 518 F.2d at 959. In *Swisher*, we noted that where Swisher's counsel was present but Swisher was not permitted to consult with him, "[l]ack of notice and of an opportunity to consult with counsel [was] intrinsically prejudicial." *Swisher, supra*, 572 A.2d at 93. Mr. Brooks should have been appointed counsel, given notice of the charged offense, and provided an opportunity to defend or explain his conduct, all of which would likely have had a material effect on the outcome of the proceedings.

PRYOR, Senior Judge, dissenting:

Appellant contends his conduct during a calendar call in the Landlord–Tenant court does not provide a basis for a finding of summary criminal contempt. He argues that the ruling was procedurally flawed and without sufficient evidence to support the conviction.

The Landlord–Tenant Branch of Superior Court is a daily point of contact for hundreds of citizens. Not surprisingly, that branch handles approximately 60,000 filings each year.[1] In order to manage such a high volume of cases, the presiding judge, assisted by administrative persons, conducts a calendar call of scheduled cases in an effort to resolve many of them by settlement or mediation. It was in this setting that this matter arose.

When appellant's case was initially called before the judge, it appeared to the judge that he was becoming irate. The judge admonished appellant to control himself, and passed the case to be called again. As the parties left the well of the court, appellant spoke loudly. When directed back to the judge, he was again warned about appropriate behavior. When the judge rendered her ruling as to appellant's next court date, appellant, while departing the courtroom, made further statements, loud enough to be heard by the judge, which included profanity. The judge then held appellant in contempt and imposed sanctions.

Contempt powers, in this context, are interwoven with the functions of a trial judge. It is thus an accepted premise that a trial judge is responsible for fair, orderly procedures, and is obliged to control obstructions, interruptions, or abuse to judicial proceedings. *See Cooke v. United States*, 267 U.S. 517, 534, 45 S.Ct. 390, 394, 69 L.Ed. 767 (1925); 75 Am.Jur.2d *Trial* § 252 (1991). It is because of these broad responsibilities that the power of summary contempt is entrusted to the court:

> The pith of this rather extraordinary power to punish without the formalities required by the Bill of Rights for the prosecution of federal crimes generally, is that the necessities of the administration of justice require such summary dealing with obstruction to it. It is a mode of vindicating the majesty of law, in its active manifestation, against obstruction and outrage. The power thus entrusted to a judge is wholly unrelated to his personal sensibilities, be they tender or rugged....

*Offutt v. United States*, 348 U.S. 11, 14, 75 S.Ct. 11, 13, 99 L.Ed. 11 (1954). This power has evolved through the years, by case decision, statute, and court rule. Our current

1. 1995 D.C. Courts Ann. Rep. 84.

rule, Super. Ct.Crim. R. 41(a), provides that a judge may adjudicate contemptuous behavior if committed in the actual presence of the judge.

Because this authority is unilateral and powerful, a number of appellate courts, including this one, have reminded trial judges to exercise restraint and care in this regard. *See McCormick v. United States,* 635 A.2d 347 (D.C.1993); *In re Schwartz,* 391 A.2d 278, 281 (D.C.1978). The concern is obvious and ever present. As stated in *Offutt,* 348 U.S. at 14, 75 S.Ct. at 13, judges are human and may, at times, use the contempt powers arbitrarily. *See In re Gates,* 248 A.2d 671 (D.C.1968) (court condemns bullying, socratic methods of trial judge).

With these concepts in mind I turn to this case. Implicitly, at least, appellant urges that the judge should have used a less restrictive response. After all, appellant's case was over and he was departing the courtroom. Therefore he was not interrupting his case. Indeed the judge had invoked no citation of contempt against him at that juncture. But it must be remembered that criminal contempt may be behavior which not only disrupts the proceedings, but is also disrespectful to the court. *In re Thompson,* 454 A.2d 1322, 1323 (D.C.1982). Here the trial judge cited both reasons in her order. It was not simply a matter of appellant's own case which was tied to his departing behavior, but rather his impact on the remaining cases during the calendar call proceeding. The judge concluded that he disrupted the administration of those cases. In addition, given the earlier warnings to appellant, she concluded that his departing behavior and profanity, in her presence, was disrespectful and abusive to the judicial process in which she was engaged. *See Jackson v. Bailey,* 221 Conn. 498, 605 A.2d 1350, 1358 (1992) (profanity deemed disrespectful to the court); *State v. Allen,* 145 Vt. 593, 496 A.2d 168 (1985) (obscene remark made in open court).

Although we have consistently and rightfully given close scrutiny to adjudications of summary contempt, in an effort to avoid judicial overreaching, *see Gates, supra,* ultimately case decision, statute and court rule authorize summary contempt when it occurs in the judge's presence. Stated simply, the trial judge has such power subject to appellate review.

There may be instances where a trial judge could impose contempt but chooses not to do so. There may be instances, in hindsight, where another course of action could have been taken. Those factors can not be a part of appellate review. We are left with primary focus on the stated authority of the rule, the elements of criminal contempt, and the procedural safeguards due the accused. Whether sufficiency of the evidence here is viewed from the familiar litmus, whether a reasonable person could find guilt under the circumstances, or by applying D.C.Code § 17–305, whether the judgment is plainly wrong or without evidence to support it, I conclude the evidence is sufficient to support the trial judge's ruling that appellant was disruptive and disrespectful. With regard to the sufficiency of the evidence, I would affirm the conviction.